914 A.2d 318 (2007)
389 N.J. Super. 576
NEW JERSEY DIVISION OF YOUTH AND FAMILY SERVICES, Plaintiff-Respondent,
v.
F.H. and A.H., Defendants-Appellants,
In the Matter of the Guardianship of H.H., K.H. and Y.H., Minors.
Superior Court of New Jersey, Appellate Division.
Argued November 1, 2006.
Decided January 23, 2007.
*322 Mary Potter, Designated Counsel, argued the cause for appellant F.H. (Yvonne Smith Segars, Public Defender, attorney; Ms. Potter, on the brief).
Thomas G. Hand, Designated Counsel, argued the cause for appellant A.H. (Yvonne Smith Segars, Public Defender, attorney; Mr. Hand, of counsel and on the brief).
Tara B. LeFurge, Deputy Attorney General, argued the cause for respondent (Stuart Rabner, Attorney General, attorney; Andrea M. Silkowitz, Assistant Attorney General, of counsel; Ms. LeFurge, on the brief).
Nancy E. Scott, Assistant Deputy Public Defender, argued the cause for minors H.H., K.H. and Y.H. (Yvonne Smith Segars, Public Defender, Law Guardian; Ms. Scott, on the brief).
Before Judges CUFF, FUENTES and BAXTER.
The opinion of the court was delivered by FUENTES, J.A.D.
F.H. (Father), and A.H. (Mother), separately appeal the trial court's decision to terminate their parental rights to their three children: "Kathy", born April 7, 1999, "Harry", born July 3, 2001, and "James", born June 15, 2002.[1] By so doing, the court granted guardianship of the children to the Division of Youth and Family Services (DYFS or Division). These appeals have been consolidated for the purpose of addressing the issues raised therein.
Both parents argue that the Division did not prove each of the four statutory elements of N.J.S.A. 30:4C-15.1a by clear and convincing evidence. F.H. also argues that the Division failed to appropriately consider: (1) placing the children with his brother as an alternative to termination; (2) that the termination of Muslim parents' parental rights, followed by a Christian adoption, undermines the children's cultural and religious heritage; and (3) that the trial court failed to make sufficient findings of fact and conclusions of law under R. 1:7-4(a).
We granted defendants' motion for a limited remand to permit: (1) the presentation of additional evidence dealing with the availability of kinship placement as an alternative to termination; and (2) to permit the parents to present expert testimony with respect to Harry's alleged medical disorder. The record before us now contains the evidence presented to the trial court after remand, as well as the court's findings and determinations after considering this evidence.
After carefully reviewing the entire record, we are satisfied that the Division presented sufficient evidence that the middle *323 child, Harry, suffered serious injuries while in his parents' custody, thus creating legal grounds to warrant the termination of parental rights with respect to this child. Although the trial court's factual findings did not adequately articulate how the abuse suffered by this child was causally linked to the acts or omissions of his parents, there is nevertheless strong circumstantial evidence supporting such a finding.
The record also shows that the evidence alleging abuse of the eldest child, Kathy, is, in and of itself, legally insufficient to warrant the termination of parental rights with respect to this child. Finally, with respect to the youngest child, James, DYFS failed to present any direct evidence that he was abused or neglected by his parents, or that, based on the abuse suffered by his siblings, there is an unacceptably high risk that he would be abused or neglected if he is returned to his parents' custody. The two memoranda of opinion issued by the trial court here did not address this issue.
Under these circumstances, we affirm the Judgment of Guardianship entered by the court with respect to Harry. We vacate the Judgment of Guardianship with respect to Kathy and James. We further remand these two consolidated cases for the Family Part to conduct a permanency hearing and determine the individualized services this family needs to insure the safety and well-being of these two children. To achieve this goal, DYFS must design a web of services that includes: (1) close monitoring and supervision, to fulfill its paramount responsibility of protecting these children from harm; and (2) emotional and therapeutic support, to provide these parents with the skills needed to successfully parent, and to insure the physical and emotional well-being of the children.
If these measures prove to be ineffectual, DYFS may re-file its Guardianship Petition as to Kathy and James. At this juncture, the trial court must find sufficient evidence causally linking any incidents of abuse or neglect to specific acts or omissions committed by a particular parent. In order to sustain a judgment terminating a defendant's parental rights with respect to children who have not been the direct recipient of abuse or neglect, the trial court must find, by clear and convincing evidence, that DYFS has demonstrated that the parent's failure to adequately respond to and/or prevent the abuse endured by one child, exposes any similarly situated sibling to a high probability of being abused or neglected.
With these legal principles as our guide, we will now address the facts developed from the evidence presented at trial.

I

A

First Referral of Abuse
According to Supervisor Dolores Cunneely, the family's first encounter with DYFS occurred on December 22, 2001. On this date, DYFS received a referral from Englewood Hospital alleging acts of neglect involving the middle child, Harry. Hospital records show that F.H. brought five-and-a-half month old Harry to the emergency room to be treated for a number of bruises. X-rays revealed a fractured elbow and an old fractured tibia.
F.H. testified that he told the hospital staff that, three days earlier, Harry's two-and-a-half-year-old sister Kathy had tried to pull the boy out of an indoor infant swing. The swing fell on top of Kathy, with Harry still strapped in the chair. F.H. did not recall whether Harry's arm was behind him or in front of him when he *324 picked him up. Hospital records corroborated F.H.'s testimony in this respect. A.H. testified consistent with her husband's account of the event, adding only that Kathy had pulled Harry's arm because she was jealous and wanted to get in the swing. A.H. did not have any knowledge about any other fractures. In fact, according to A.H., Harry had not been involved in any other falls prior to this incident.
At this time, a hospital staff physician advised DYFS that Harry may be suffering from a medical condition known as Poland Sequence.[2] If in fact Harry was afflicted with this physical disorder, he may not have been producing enough calcium for his bones. Harry's pediatrician confirmed this preliminary diagnosis. In this light, DYFS listed the case as "unsubstantiated for abuse," and Harry was discharged to his home a few days later.

B

Second Referral of Abuse
Approximately five weeks later, DYFS received a second referral from Hackensack University Medical Center. This time, Harry was brought into the hospital with facial bruising. A skeletal survey showed multiple fractures in different stages of healing. F.H. testified that he took Harry to the hospital because the child: (1) was not eating and appeared dehydrated; (2) had bruises on his face; and (3) had a cut under his lip. F.H. did not know that Harry had suffered multiple fractures of both arms and one leg. He was also unaware of what caused the facial bruises or the lip cut. With respect to this incident, A.H. testified that she did not know what caused the fractures. She had not detected any physical change in Harry between the two hospitalizations. It was her practice to always call the doctor when she saw something "different with him."
According to DYFS Supervisor Cunneely, the parents had no explanation for the fractures. Despite this disturbing absence of any plausible explanation, the Division again concluded that the allegations of abuse were unsubstantiated, because the child's medical condition was still under review. On January 30, 2002, Dr. Cheryl Kurer indicated that Harry had normal heart function. A report from the geneticist Dr. Robert Wallerstein issued the following day, concluded there was no evidence of "osteoporosis or Wormian bones that would offer an explanation for the fractures." Harry was discharged from the hospital and returned to his parents' custody on February 8, 2002.
Both parents declined the Division's offer to provide homemaker services, stating that the maternal grandmother was coming from Egypt to assist A.H. with the care of the children. Despite this initial disinterest from the parents, DYFS assisted the family in obtaining Medicaid benefits, and continued to monitor the situation until May 2002, when the grandmother arrived. In the absence of medical information concretely establishing the occurrence of an incident of abuse or neglect, DYFS closed the case.
In January 2002, F.H. worked five days per week in two family-owned businesses. His work schedule consisted of seventeen-hour shifts on two of the five days, and ten-hour shifts on the other three days. *325 In July 2002, F.H. was incarcerated for federal tax evasion, leaving A.H. as the primary caretaker for the three children. A.H. did not work outside the home.

C

Third Referral of Abuse
The Division received a third referral, from the Palisades General Hospital, on December 4, 2002.[3] This time Harry was diagnosed with a severe hip fracture. A.H. brought him to the hospital. She explained that around eleven o'clock that evening the boiler providing heat for the apartment had stopped working. The electric heaters she used had short-circuited the house's electrical system, and all of the children had gone to one room to cluster around the portable heaters. As the only adult present, A.H. said she was scared and confused.
At one point, she went to the basement to check on the power. When she returned "maybe eight minutes" later, one-and-a-half-year-old Harry was crying. He had fallen approximately two feet from the bed to the carpeted floor. When she asked Kathy what had happened, the child explained that she had been jumping on the bed and either fell on Harry, or the boy fell off the bed onto the floor. At this stage of his development, Harry could crawl and pull himself up, but could not yet walk on his own.
When A.H. checked Harry, she "saw some bruises, some redness around his legs," but did not detect any other injuries, including fractures. In fact, she thought he was fine because he had stopped crying and went to sleep. As she prepared to bathe Harry the next morning, however, A.H. noticed he was standing "crooked," and immediately called for an ambulance.
On a "consultation sheet" dated December 5, 2002, Dr. Wallerstein noted that the Poland Sequence diagnosis "does NOT explain fractures or increased tendency to bone fragility" but the "assessment was incomplete" because there was no information about "developmental/neuromotor status." This consultation sheet also reflects that Dr. Wallerstein was "suspicious of an underlying genetic etiology but [he] had no documentation of a specific syndrome." A skeletal survey dated December 5, 2002, indicated that Harry's bones were "normally mineralized."
On December 11, 2002, the Division obtained legal and physical custody of the three children, and placed them in a foster home on the following day. The Division requested two consultations on the case  one from a DYFS nurse and another from the Audrey Hepburn Children's House. DYFS also referred A.H. for a psychological evaluation. By this time, F.H. was incarcerated, and the maternal grandmother was not yet residing with A.H.

D

Abuse Substantiated
In a March 31, 2003, report entitled "therapy referral," the Division, for the first time, noted that neglect (with respect to Harry) had been substantiated, because the parents had not provided a reasonable explanation for the multiple fractures suffered by the child between December 22, 2001, and December 4, 2002. In June 2003, the Division received additional genetics test results from Dr. Wallerstein, who concluded that "there was no specific [medical] explanation for bone fragility." *326 In this same report, Dr. Wallerstein noted that the skin biopsy test that had "normal" results was "85% accurate in ruling out osteogenesis imperfecta."[4]
As the mother of the children and the only adult available at the time of the removal, DYFS offered A.H. weekly supervised visitation  first from the Children's House and then from the International Institute. She was provided with twelve therapy sessions with Dr. Lafontant from the International Institute, and with parent education classes with the Red Cross. The record does not reflect whether A.H. requested that DYFS provide her and the children culturally sensitive services. The record is equally silent on whether, if requested, DYFS was able to provide culturally sensitive services such as therapists or psychologists knowledgeable about Muslim childrearing practices.
DYFS initially classified Harry as "medically fragile," placing him in a second foster home that specialized in medically fragile children. Harry remained injury-free from December 12, 2002, when he was placed in the first foster home, to March 26, 2003, when he was placed in the specialized foster home. In September 2003, Harry was again moved to a different specialized foster home when the earlier foster family relocated out of state.
Although he continued to have developmental delays, Harry did not have any behavioral problems in foster care. He did have an unusual reaction to bathing. The first foster mother reported to DYFS that Harry "screamed bloody murder if he had to get in the bathtub." A subsequent foster mother also reported that Harry hated to take a bath and "screams when taken into the bathroom." By contrast, A.H. denied having had any problems with Harry in the bathtub.
In June 2003, Kathy, who Cunneely described as a "very active" and "sometimes aggressive" child, was referred for assessment by the Institute for Child Development to the Therapeutic Learning Center, which works with children that have behavioral problems. After four therapy sessions with A.H., the International Institute issued a letter dated July 2, 2003, indicating that she did not pose a risk to the children. Because this letter did not address or explain Harry's injuries, DYFS requested a second risk-assessment report. By letter dated August 11, 2003, the International Institute reiterated its earlier assessment, this time describing the topics covered in therapy.
Based in part on this evidence, the Division began developing a reunification plan for A.H. Although during that time F.H. was still incarcerated, he participated in court proceedings by phone. A.H. continued therapy for the twelve sessions offered by DYFS.

II.

Evidence Involving Kathy and James
Kathy and James were returned to A.H.'s custody and care on September 22, 2003. By this time, the family was in financial crisis. On or about October 8, 2003, A.H. notified DYFS that she had moved to an apartment across the street from her previous residence, after losing her home to foreclosure. The new apartment was sparsely furnished; most of the furniture was in storage. The Division reviewed and approved this living arrangement, *327 and Harry began to have weekend visitation with mother and siblings.
The Division's plan to reunite Harry with his family proved to be short lived. On December 31, 2003, DYFS received a referral from the therapeutic learning center reporting that Kathy had injuries or small bruises. According to Kathy, her maternal grandmother had pinched her about a week or two weeks earlier; and her mother had also hit her.
DYFS caseworker Melena Anderson went to the school to investigate. Anderson noticed a bloody scratch on Kathy's ear, a scratch on her left hand, and a small bruise on her upper arm. Kathy told Anderson that her grandmother had pinched her, scratched her and punched her arm because she had not listened to her mother. The school advised Anderson that that they had made two other referrals to DYFS earlier that month that had not been addressed. Thus, there were three incident reports in total.
The first incident allegedly occurred on December 12, 2003. Kathy told school staff that her grandmother had squeezed her inner thighs. The staff also noticed a bruise on the child's upper lip. The second incident was noted a week later, on December 19, 2003. On this date, Kathy reported that her mother was mad at her, spanked her, pinched her, and forced her to stand against a wall with her hands held up above her head. The school nurse noticed a small bruise. Finally, on December 31, 2003, Kathy reported that her grandmother had pinched and punched her. No physical evidence was noticed to corroborate this allegation.
According to caseworker Anderson, both Kathy and James were "dressed inappropriately, in terms of the number of layers of clothes." Although it was December and the school was "comfortable," Kathy was wearing four shirts, one sweater and two pairs of pants. She said that her mother would get mad if she took the layers off, and was not allowed to do so even if she was uncomfortable.
Anderson visited A.H. and the maternal grandmother that same day. The interview was conducted in English. A.H. translated for her mother. Although Anderson spoke to A.H. directly, without the assistance of an interpreter, she "never got the sense [they] were misunderstanding each other." A.H. reported that Kathy had not had any marks or bruises when she left the house. A.H. called Kathy a liar "many times," and denied that she or her mother had hurt Kathy in any way.
As part of her Referral Response Report dated January 2, 2004, Anderson noted that "[t]he Director of the school, Cindy Hick, indicated that [Kathy] has made stories up before. [A.H.] had called the school recently stating that [Kathy] reported that a teacher at the school had hit and pushed [Kathy] but that this did not happen as corroborated by the school staff."
Conversely, A.H. testified that from the start of their conversation, Anderson's tone with her was stern and accusatorial. A.H. testified that she got Kathy ready for school that morning while her mother slept. Kathy was not bleeding when she left the house, and "had no problems whatsoever" when she took her to the bus that morning. Kathy had come home from school with bruises on prior occasions, and had reported that other kids on the bus would hit her and take her food. A.H. testified that she had called the school and even spoke to the bus driver, without results.
Kathy came home from school while Anderson was talking to A.H. According to Anderson, the child appeared "very timid and nervous," and kept looking fearfully at her grandmother until Anderson asked *328 the grandmother to leave the room. At Anderson's request, Kathy told A.H. about the marks, and about what her grandmother had done. A.H.'s response was both guarded and skeptical. She twice asked Kathy whether she was sure that it was not done by another child at school, to which Kathy responded: "No."
At trial, A.H. admitted that Kathy had told her that the grandmother had caused the scratches and bruises. She denied calling Kathy a liar, however, claiming that she had simply characterized the "conversation" as a lie. Because she believed her daughter, A.H. asked her mother to leave in July 2004.
During the interview, A.H. told Anderson that another caseworker and case aide had inappropriately touched Kathy between her legs. Although the incident had allegedly occurred two weeks earlier, A.H. had not reported it because she did not think anyone would believe her. She also wanted to wait for her husband to come home. In response, DYFS supervisor Cunneely testified that she did not have direct knowledge of the resolution of the allegations, but understood that the charges were not substantiated. Neither parent addressed those allegations during their testimony.
As part of the investigation, Anderson spoke privately with Kathy about the molestation allegations. Using a doll, Anderson asked Kathy whether anyone had ever touched her in the breast or "crotch area." Kathy pointed to her inner thighs, and said her grandmother had touched her there. In response, DYFS decided not to permit any contact between Kathy and the grandmother.
Not fully satisfied with this arrangement, Anderson unsuccessfully attempted to get a homemaker to start immediately. Without the presence of a third-party, DYFS decided to remove all of the children from their home. Understandably, A.H. became very upset and continued to call Kathy a liar. She spoke to Kathy in Arabic, causing the child to tell Anderson "something" about the prior caseworker. A.H. continued to talk to Kathy in Arabic until Anderson asked her to stop.
Once the children were in the car, Anderson asked Kathy if the caseworker had ever touched her. Kathy responded by pointing to her chest and the inside of her thighs. Anderson asked if he ever touched her under her clothes or hurt her. Kathy said: "No." In fact, Kathy said that the caseworker had been nice to her. When asked where the aide had touched her, Kathy pointed to the top of her head.
By way of a potentially innocuous explanation, Anderson testified that the car seats used to transport Kathy had a strap across the chest, and a strap between the legs. This may account for the alleged improper touching. DYFS eventually concluded that no improper touching involving its employees had occurred. Kathy and James were thus removed from their mother's care and placed in a foster home together.
After a permanency hearing pursuant to N.J.S.A. 9:6-8.54b(2), the case was transferred to the Adoption Resource Center (ARC) on March 19, 2004, with the goal of terminating defendants' parental rights. When asked why the Division changed its goal from reunification to termination of parental rights, Supervisor Cunneely explained:
After the second removal of the two children and [Harry] not having been reunified the case was assessed at that point in time, given the history in combination with everything else, and the second removal and still no  no taking of responsibility or explanation for the things, the Division presented that plan *329 in the permanency hearing which was accepted.
By that time, F.H. was living in a halfway house in Newark as part of a work-release program. He had not had any contacts with the children since his incarceration.

III

Services Provided By DYFS
On August 26, 2004, DYFS adoption worker Danielle Piotrowsky was assigned to be the family's caseworker in the ARC. She continued in that capacity up until the time of the trial. At the time the case was transferred to the ARC, A.H. was attending parenting classes. A.H. participated in counseling, had supervised visitation with the children, and was subjected to bonding and psychological evaluations. Piotrowsky testified that A.H. had attended all the parenting classes and counseling sessions as requested by the Division. Despite her cooperation, A.H.'s therapist was nevertheless concerned about her refusal to discuss the maternal grandmother. She also did not take responsibility for Harry's injuries and apparent abuse.
The record shows that the supervised visitation program was changed several times in response to a series of events mostly involving F.H. First, there was a "verbal altercation" between F.H. and the foster mother. As a result, the foster mother felt threatened and did not want to transport Harry to the visits. Second, F.H. became "irate" and "was disrespectful" to DYFS representatives when Harry was on vacation with his foster mother, and unable to attend one of the visits. The DYFS driver also objected to transporting F.H., claiming that he improperly "interrogated" the children about the foster home during the transport. Finally, F.H. became angry when the children were brought to the visits late.
According to Piotrowsky, the Adoption House had concerns about the parents' ability to control the children and found their parenting and disciplinary methods wanting. There were specific concerns about A.H. being too passive and not setting limits with the children. By the time the trial began, the Adoption House was no longer responsible for the supervised visitations. The staff felt intimidated by F.H. Reports of the visits documented that F.H. had a pattern of being "bullying, demanding," and intimidating if things did not go his way. A.H. was characterized as "extremely passive."
On November 18, 2004, Harry was moved for a fourth time since being placed in the Division's custody. Having been declassified from his medically fragile status, Harry was placed in a regular foster home. At the time of the trial, he was still experiencing developmental delays and had special behavioral and emotional needs. Significantly, Harry had not suffered any injuries since being placed in foster care in December 2002.
Kathy continued to exhibit "aggressive tendencies." She was receiving counseling, and was attending a regular kindergarten class. Although she was doing "okay" in school, she continued to wet the bed. James had little to no interaction with his parents, but also exhibited aggressive tendencies. Although Kathy's and James's current foster mother had expressed an interest in adopting both children, Harry's foster family was not similarly inclined.
On cross-examination, DYFS Supervisor Cunneely admitted that the Division never investigated whether anyone other than the parents could have been responsible for the injuries because "[t]here was never any information given of an opportunity of *330 anybody else." Cunneely also agreed that A.H. had gone to whatever services were offered by the Division, and had otherwise cooperated fully with all of the services offered.

IV

Alternatives to Termination
With respect to possible placement with a relative, Cunneely testified that the only relative provided to the Division was F.H.'s brother. Efforts to contact this person were initially frustrated because the Division was given an incorrect phone number. When the brother was eventually contacted in January 2003, he indicated that he had five children of his own, and had to think about it. The Division did not hear back from him. Neither parent addressed placement with the father's brother in their testimony.
We remanded the matter to permit the parents to present additional evidence as to kinship placement. Two lay witnesses testified for the parents at the remand hearing. In lieu of live testimony, the trial court also accepted two certifications submitted by the parents in support of their motion for a remand. Thus, the court considered the certifications of F.H.'s former wife and the daughter from that marriage.[5]
As noted earlier, two witnesses testified for the parents at the remand hearing. Susan Hudick lived next door to the family for five years before they moved to the apartment across the street. She testified that she never heard fighting, yelling, or crying coming from the house. She observed both parents being "very caring" with the children. Kathy was "playful" and "charming" and "an active three year old." The children were always "clean and neat." She "heard [the parents] angry with each other" or with the children. Hudick admitted, however, that she had no direct knowledge of how Harry had been injured.
F.H.'s brother S.H. was the second witness to testify at the remand hearing. The brothers lived near each other in Brooklyn during F.H.'s first marriage. S.H. expressed no concerns about leaving his own children in his brother's care. In fact, S.H. claimed that F.H. spoiled his children. He never saw F.H. being physically aggressive towards his children, or being abusive to them or even yelling at them. He never observed any "marks" on the children. S.H. described his brother as "very patient" and "very polite." He admitted, however, that he was not present at the times Harry or Kathy were injured, and had no independent knowledge of those injuries.
With respect to his willingness to take custody of the children, S.H. claimed that "[i]n the beginning," he asked for the phone number for the DYFS caseworker. When the caseworker mentioned that he could adopt the children, he responded that he had five children of his own and was "not a millionaire." The caseworker said she would "send the paper anyway" but he never received it. S.H. claimed that he "contacted her again and [sic] with no luck." He had only this one conversation with a DYFS representative.

V

Expert Testimony

A
At DYFS's request, psychologist Ernesto Perdomo evaluated F.H. and A.H. individually, *331 for the purpose of conducting a bonding evaluation between the children and the parents. His intent was to "determine whether [the parents] would be able to be effective parents and whether the children would be in any kind of risk with them." The examinations took place on five dates between February and July 2004.
Perdomo conducted a diagnostic interview and gave several psychological tests to F.H. At trial, Perdomo expressed some concerns about the validity of the tests in light of the parties' cultural differences.
I did some testing because he was able to speak enough English well enough, and he said he understood. My concern is that he comes from [a] different country, social[,] cultural and even religious background is very different from the main standards and norms used in the test. So the test  that's why I said you have to be very careful with those tests because of the cultural differences of [F.H.] But the test itself didn't reveal any problem anyway  doesn't reveal any major problem.
Perdomo also reviewed reports prepared by the Division. The entire interview was conducted in English, and lasted between an hour-and-a-half to two hours.
Perdomo found no indication of any mental problems. He found F.H. to be in denial about the problems with Harry, because he believed that the boy suffered from a medical condition, and that the Division was just "against them." He believed that the second removal of the children was in retaliation for pressing charges against the caseworker. He also questioned the care the children had received in the foster home.
With A.H., Perdomo used an interpreter to assist with the "extensive clinical interview" lasting about an hour-and-a-half. He was unable to conduct any psychological tests because of cultural and language barriers. Despite these shortcomings, Perdomo found A.H. to be very educated, calm and with no indication of any mental disorder. She blamed Harry's injuries on his "fragile bones" and rough play with Kathy. She also claimed that Kathy was injured at the new therapeutic school, and that she had complained to the school about the bruises that they now claim she inflicted on her. A.H. did not accept any responsibility for the injuries to her children, nor did she take responsibility for failing to protect Kathy from the grandmother. In fact, she denied that the grandmother had done anything wrong.
Perdomo found that both parents fervently wanted the return of their children. Perdomo was concerned, however, that neither parent accepted responsibility for the injuries sustained by Harry, and blamed the Division for their family's upheaval. Perdomo thus concluded that neither parent would be able to protect the children against future harm.[6]
In the area of bonding, Perdomo found that the children were very attached to their parents. Both parents acted "very appropriate" with them, and the children interacted comfortably with them. Overall, Perdomo found the children to be "very bonded" to the parents.
In light of the serious injuries sustained by Harry, Perdomo recommended that the Division proceed cautiously in any attempts *332 to reunite the family. He also suggested family therapy as a precondition to reunification. In his opinion, both parents needed to recognize the problem presented by Harry's unexplained injuries, and accept the fact that these injuries were not caused by a medical disorder. Without these acknowledgments, Perdomo believed there was a "very high" risk that there would be more injuries.
Perdomo did not view Kathy as a risk to Harry. He took note of the fact that Harry did not suffer any further injuries after he was separated from his parents, even though he was initially placed in foster care together with Kathy. He also concluded that Kathy was safer as a result of being removed from her mother's custody. In support of this conclusion, he noted that Kathy did not suffer any further injuries after the second removal, even though she continued to attend the therapeutic day school that A.H. alleged was the cause of her injuries.
On cross-examination, Perdomo admitted that the parents could benefit from services such as family therapy, counseling, parenting classes and supervision. He insisted, however, that the parents needed to accept responsibility for Harry's injuries, before any meaningful progress could took place.

B
The court also considered the testimony of psychologist Charles Hasson. He conducted psychological evaluations of the parents and bonding assessments of the children with the parents and foster parents at the request of the Law Guardian. The examinations took place on six dates. He indicated that he discussed with the parents the fact that the consensus among the medical professionals who had examined Harry, was that a medical disorder could not account for the frequency and severity of the child's fractures. He also emphasized that Harry had not had any similar injuries since being placed in foster care.
According to Hasson, both parents remained steadfast in their belief that Harry had been afflicted with the medical condition known as "Poland Sequence." The parents believed that this medical disorder was "time limited" and that F.H., who also had that condition as a child, had the same experience with bone fractures. The problem eventually subsided as F.H. grew older. In this light, the parents continued to deny any responsibility for Harry's injuries, and attributed the cause to Kathy. A.H. also denied any responsibility for Kathy's injuries.
In the process of conducting the interviews with the parents, Hasson confronted the same cultural difficulties that Perdomo experienced. Hasson interviewed A.H. for about two-and-a-half hours. He found her cooperative, but frightened, guarded, and defensive in her responses. Although she was intellectually aware of the reasons proffered by the Division for the removal of her children, A.H. believed that she and the children were victims of the Division's wrongful and unfounded accusations. A.H. believed that the Division was retaliating against her for spurning the caseworker's sexual advances. When asked about Kathy's allegations that she and her mother (Kathy's grandmother) had hurt her, A.H. claimed Kathy was a liar. Overall, Hasson was critical of A.H.'s failure to take affirmative steps to protect her children.
Hasson did not find any evidence that A.H. was suffering from any mental or mood disorder. He believed her to have limited problem-solving skills, and described her as intelligent, but immature and weak. According to Hasson, those *333 character traits would make it difficult for A.H. to manage as a parent, especially with a "very difficult" and aggressive child like Kathy, and a child like Harry, who has developmental difficulties. Taking all of these factors into consideration, and adding the problems presented by F.H.'s incarceration, (limited financial resources, coupled with traditional social alienation and cultural displacement experienced by all new immigrants) Hasson opined that A.H. suffered from mild chronic situational depression, and that she had certain dependent and passive-aggressive traits. He also believed that A.H. was in denial about her need for assistance.
Hasson interviewed F.H. for about two-and-a-half hours and conducted a series of psychological tests. He described F.H. as "cool, calm, collected," with "[v]ery low social anxiety." He opined that F.H. had "an arrogant, haughty quality about him, where he feels as if he knows best, rather than other people." He was "self assured" and "completely confident in who he is, his view of life, his view of a reality and his decision  decisions that he thought he made." In contrast to A.H., Hasson found F.H. "verbally fluent." Intellectually, Hasson characterized F.H. as "a very bright guy." F.H.'s psychological tests results showed that he was guarded in his responses.
According to Hasson, F.H. also took no responsibility for Harry's injuries or for lack of supervision of the children. He offered no explanation for Harry's second injury. He believed that the final injury, which resulted in the removal of all three children, was "just an accident." With respect to the second removal of the two children, F.H. asserted that this was done in retaliation for A.H. refusing the caseworker's sexual advances. He viewed the DYFS system as corrupt, and maintained that Harry had not suffered any injuries since being removed from the home because he outgrew his medical problem.
Hasson observed Kathy and James with the foster mother for a one-hour bonding session. Based only on these limited observations, he opined that the foster mother "was really good in terms of controlling the situation" and intervening when there was a problem. She engaged the children and "was gentle with them." Both children called her "mommy" and were affectionate with her. According to Hasson, the foster mother indicated that Kathy seemed frightened when she first came to live with her, would flinch if chastised, and was anxious and wet the bed after visiting with the biological parents.
Hasson also conducted a bonding evaluation with both parents and with each parent individually. He found that A.H. "took a secondary role" and F.H. "organized and structured" the visit. F.H. directed A.H. to study math with Kathy, while he played physically with the two boys. As the visit progressed, the children "became more and more out of control" with Kathy pulling her mother's hair, Harry smacking his mother on the back, and the children getting aggressive towards each other. When Hasson observed A.H. alone, she could not control the children, and appeared exhausted by the end of the visit.
In his opinion, both parents have difficulty with parenting their children in a way that would protect the children from harm. Hasson believed that the parents "lack the ability to bring out the best in their children, and to encourage their children to developmental growth." As such, Hasson concluded that the children would be "in high risk" if returned to the parents because F.H. has a "quick temper with the children," and A.H. is overwhelmed by her parenting duties. Hasson ruled out the possibility that DYFS-sponsored therapy and other services would be sufficient to *334 counteract these problems, because the parents had not acknowledged that they had problems, and thus lacked the motivation to change their behavior.
Finally, Hasson stated in his report that "[b]oth parents have serious emotional issues and bring out the worst in the children" and "had a toxic effect" on them. He did not think reunification was "a viable direction," because "there's just too many obstacles for both of those parents to overcome."

C
Psychologist Paul Fulford testified on behalf of the parents. He examined the family twice during June and July of 2004, without the benefit of an interpreter. He reviewed certain discovery material from the Division and conducted intelligence and various personality and parenting tests on both parents. He did not review any hospital records or medical reports.
Fulford found F.H. to be of normal intelligence and cooperative with the testing. He noted that F.H. "appeared to have an investment in appearing good" as revealed in the personality assessment study. Fulford found A.H.'s testing underestimated her abilities, possibly due to cultural or linguistic factors. He found no intellectual deficiency in A.H. and no significant depression or mood disorder.
After conducting a bonding evaluation with the children, Fulford described the family as affectionate and spontaneous. Although he found the children to be "lively," he did not think that the parents had difficulty controlling them. He concluded that the parents were able to successfully parent the children.
With respect to the medical issues involving Harry, Fulford opined that both parents "realize[d] the seriousness of the matter" and "that this requires close or perhaps closer than the average parent level of supervision and changing the environment." According to Fulford, both parents admitted "that they might have made some mistakes or errors," but denied they did anything "deliberate." In Fulford's judgment, the parents were confused by F.H.'s own medical history as a child. As to the incidents involving Kathy and the grandmother, Fulford testified that A.H. was "upset by it" and that the grandmother "was no longer involved in the caregiving."

D
Dr. Julia DeBellis, the Medical Director of the Audrey Hepburn Children's House, was the final expert witness to testify before the trial court. Dr. DeBellis was called by the Division and admitted by the court as an expert in pediatrics and child abuse. Dr. DeBellis was retained as consulting physician after Harry's second hospitalization. She was specifically asked to "give an opinion regarding accidental and non-accidental trauma, child abuse and neglect." She reviewed all of the medical records available from the different hospitals.
With respect to the January 2002, consultation, Dr. DeBellis found it "important" that Harry had multiple fractures in different stages of healing. She thus recommended that the child be evaluated by a geneticist, radiologist and hematologist. Some of these test results were still pending when Harry was first discharged.
At trial, Dr. DeBellis opined that the metafacial corner fracture found on Harry's shin at the time of the January 2002, hospital admission "has a high specificity for non-accidental trauma" and that the "quality of force" required for such an injury was "particularly attributed to or described in a shaking scenario." At that time, Harry also had other old and new *335 fractures of the type that could have been accidental with children who are ambulating. In this case, these injuries could not have been accidental, because Harry, who was developmentally delayed, was not even rolling over at that time.
Under these circumstances, Dr. DeBellis concluded that the shin and forearm fractures found on Harry at that time were not consistent with the explanation given, i.e., that the child fell from the arms of his sister. According to Dr. DeBellis, "it is rare for a child to sustain a fracture from a short fall."
After reviewing the hospital admission records from December 21, 2001, Dr. DeBellis reiterated that Harry's fracture on that occasion was also not consistent with the explanation provided, i.e., that a two-and-a-half-year-old "yanking" on the arm of a five-month-old infant caused the injury. More force would have been required to cause this injury.
According to Dr. DeBellis, the radiological report indicated that Harry's bone mineralization was normal. This meant that there was "no radiological evidence of bone fragility." When multiple fractures are found in an infant, physicians look at the quality of the bones or for other abnormalities, such as the presence of wormian bodies, "which may indicate a condition like osteogenesis imperfecta," "rickets or other bone, nutritional bone abnormalities that would alert [the physician] to a lower threshold for fracture."
The staff at Hackensack University Medical Center found no "bony abnormalities and no wormian bodies present." No calcium deficiency or renal problems were found. Harry also had normal levels of phosphorus and vitamin D. "Assuming normal bones," Dr. DeBellis testified that younger children are less likely to fracture accidentally because of their limited mobility. Although Harry did have hypotonia, and had been earlier diagnosed with Poland Sequence, fragile bones are not considered part of either disorder.
In Dr. DeBellis's opinion, Harry's fractures were non-accidental. This conclusion was also supported by the fact that the child had not suffered any further fractures since he was placed in foster care on December 12, 2002. She did not find anything in "the literature" to indicate that Harry would be less prone to fractures after age seventeen months, or that a child with fragile bones would get stronger as he got older. In fact, she stated that children are more likely to fracture as they get older and become more mobile. When questioned about F.H.'s claim that the "consequences of Poland Sequence would resolve itself after the age of two," Dr. DeBellis explained that the condition "reflect[s] anatomical abnormalities" that will not just go away without medical intervention.
Dr. DeBellis thus opined, to a reasonable degree of medical certainty, "that [Harry] does not have a medical condition that predisposes him to fractures."

VI

Trial Court's Findings
In a brief four-page memorandum of opinion, the trial court found that: (1) the parents offered no explanations for the cause of the nine bone fractures suffered by Harry before he was eighteen months old; (2) the allegations of a genetic condition that made the child's bones fragile or predisposed to fractures were not supported by the medical evidence; and (3) the conduct attributable to the older sister, characterized as "rough play," did not adequately explain the serious injuries sustained by Harry. The court was persuaded by the "undisputed medical expert findings" that Harry's bones were normal, *336 and that the fractures could not have been caused accidentally. The court thus concluded that "[Harry's] parents physically abused him causing him great harm."
After detailing the hospitalizations, the Division's efforts, Kathy's injuries, and the parents' denials of responsibility, the trial judge noted only that the parents "are not credible" and "their three children would be at substantial risk of physical harm if returned to their custody."
After conducting the hearing required by our remand order, the trial court issued a three-paragraph supplemental memorandum of opinion, finding that "[n]one of the witnesses offered any testimony concerning the factual issues regarding the abuse and neglect of the children." The court thereafter reaffirmed its earlier findings and conclusions.

VII

Legal Analysis
We start our analysis by reaffirming certain bedrock principles of law that will inform and guide our discussion of the issues raised herein. Parents have a fundamental constitutional right to enjoy a relationship with and raise their children. In re Guardianship of K.H.O., 161 N.J. 337, 346-47, 736 A.2d 1246 (1999). This constitutional protection is "tempered by the State's parens patriae responsibility to protect the welfare of children." In re Guardianship of J.N.H., 172 N.J. 440, 471, 799 A.2d 518 (2002). This delicate balance is achieved through application of the "best interests of the child" standard. K.H.O., supra, 161 N.J. at 347, 736 A.2d 1246. "In particular, `parental fitness is the key to determining the best interests of the child in parental rights termination cases.'" J.N.H., supra, 172 N.J. at 471, 799 A.2d 518 (citing In re Guardianship of B.L.A., 332 N.J.Super. 392, 402, 753 A.2d 770 (Ch. Div.2000)).
Under N.J.S.A. 30:4C-15.1a, DYFS can initiate a petition to terminate parental rights on the grounds of the "best interest of the child," if each of the following four elements is met by clear and convincing evidence:
(1) The child's safety, health or development has been or will continue to be endangered by the parental relationship;
(2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his foster parents would cause serious and enduring emotional or psychological harm to the child;
(3) The division has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and
(4) Termination of parental rights will not do more harm than good.
The statute "prescribes an integrated multi-element test that must be applied to determine whether termination of parental rights is in the best interests of the child." In re Guardianship of DMH, 161 N.J. 365, 375, 736 A.2d 1261 (1999).
Transferring guardianship to the State terminates all parental rights of the natural parents, permanently cutting off the relationship between the children and their biological parents, and is a prerequisite to having a child adopted. In re Guardianship of J.C., 129 N.J. 1, 5, 608 A.2d 1312 (1992). When the child's biological parents resist the termination of their parental rights, the court must decide *337 whether the parents can raise their children without causing them further harm. Id. at 10, 608 A.2d 1312. Generally, proofs in termination cases "focus on past abuse and neglect and on the likelihood of it continuing." Ibid. "The burden falls on the State to demonstrate by clear and convincing evidence that the natural parent has not cured the initial cause of harm and will continue to cause serious and lasting harm to the child." Ibid.
"[P]roof of the abuse or neglect of one child shall be admissible evidence on the issue of the abuse or neglect of any other child of, or the responsibility of, the parent or guardian. . . ." N.J.S.A. 9:6-8.46; see also Div. of Youth and Family Servs. v. Robert M., 347 N.J.Super. 44, 68, 788 A.2d 888 (App.Div.) (noting that the abuse of one child may pose a danger to other children in the household), certif. denied, 174 N.J. 39, 803 A.2d 635 (2002); J. & E. v. M. & F., 157 N.J.Super. 478, 493, 385 A.2d 240 (App.Div.) (noting that "[p]redictions as to probable future conduct can only be based upon past performance" and "[e]vidence of parents' fitness or unfitness can be gleaned not only from their past treatment of the child in question but also from the quality of care given to other children in their custody"), certif. denied, 77 N.J. 490, 391 A.2d 504 (1978).
Our scope of review of a trial court's decision to terminate parental rights is limited. J.N.H., supra, 172 N.J. at 472, 799 A.2d 518; In re Guardianship of Jordan, 336 N.J.Super. 270, 273, 764 A.2d 503 (App.Div.2001). In a non-jury case, we must "decide whether the findings made [by the trial court] could reasonably have been reached on substantial credible evidence present in the record when considering the proofs as a whole, giving due regard to the opportunity of the trial judge to determine credibility." N.J. Div. of Youth and Family Servs. v. A.G., 344 N.J.Super. 418, 442-43, 782 A.2d 458 (App. Div.2001), certif. denied, 171 N.J. 44, 791 A.2d 222 (2002). A trial court's findings of fact are entitled to great deference and will not be disturbed on appeal unless those findings are not fairly supported by adequate, substantial, and credible evidence. Lawson Mardon Wheaton, Inc. v. Smith, 160 N.J. 383, 403, 734 A.2d 738 (1999); Rova Farms Resort, Inc. v. Investors Ins. Co. of Am., 65 N.J. 474, 483-84, 323 A.2d 495 (1974).

A

First Prong

Harm to the Children
Under the first prong of the statute, the State must show harm to the child by the parental relationship. N.J.S.A. 30:4C-15.1a(1); K.H.O., supra, 161 N.J. at 348, 736 A.2d 1246. The harm shown "must be one that threatens the child's health and will likely have continuing deleterious effects on the child." K.H.O., supra, 161 N.J. at 352, 736 A.2d 1246.
The nature and extent of the injuries sustained by Harry were not disputed. Instead, the parents focused on whether the Division proved that such injuries were not caused by Harry's alleged medical condition. On appeal, neither parent refers directly to Kathy's injuries inflicted by either A.H. or her maternal grandmother.
F.H. contends that the State did not meet its burden of proof on the first prong, because the expert testimony presented did not definitively rule out that Harry did not suffer from a medical condition that rendered him more vulnerable to fractures. A.H. also argues that "no one is certain whether [Harry]'s genetic make up [sic] contributed to his broken bones."
The Division concedes that Harry was "a special needs child who was born *338 with Poland's sequence; has suffered from scoliosis; and has experienced developmental delays." The Division argues, however, that Harry's nine unexplained fractures in the first year-and-a-half of his life indisputably establish that the child was not properly nurtured by his parents. Thus, the burden of proof on the first prong was clearly met based on the unrebutted medical evidence that the fractures "were the result of non-accidental trauma." The Law Guardian joins the Division's arguments, arguing that the parents' insistence that Harry has "fragile bones," despite all medical evidence to the contrary, is untenable and irrational on its face.
We are satisfied that the evidence before the trial court, established by clear and convincing evidence, that the multiple fractures endured by Harry during the early part of his life were not caused or facilitated by a medical condition. Dr. DeBellis was the only medical professional who was qualified, by training and experience, to offer an opinion on this subject. Her diagnosis ruled out the presence of osteogenesis imperfecta, rickets or other bone or nutritional abnormalities as medical conditions that would alert a physician to a lower threshold for fracture.
Dr. DeBellis also indicated that Kathy could not have been responsible for Harry's two injuries, because the first injury was not consistent with being pulled out of a swing; the second injury required more force than a child of Kathy's age could muster. Finally, Dr. DeBellis took particular note, as did the trial judge, that Harry has remained injury-free throughout the entire time he has been in foster placement.
Thus: (1) the absence of objective evidence establishing a medical explanation for the injuries; (2) the implausibility of the parents' explanation for how these injuries occurred; (3) the presence of healed or partly healed injuries; and (4) the cessation of further trauma after the child's removal from the parents; all led the trial court to conclude that the Division established, by clear and convincing evidence, that Harry's injuries were the result of abuse or neglect by the parents. In other words, the court imputed liability to the parents because the injuries to the child occurred on their watch.
We agree that the evidence just described presents a strong circumstantial case that, at the very least, the parents permitted Harry to be seriously injured while he was in their custody. The presence of healed injuries also indicates a lack of due diligence in seeking medical attention for the child. All that being said, however, there is also clear evidence that the parents, especially A.H., have been compliant with all of the Division's requests. Both parents also have a strong and loving bond with the children and they with them, including Harry.
We also recognize that after F.H.'s incarceration, A.H. was left alone to deal with the economic and emotional crisis created by his absence. Although she was eventually joined by her mother, A.H. remained, for the most part, solely responsible for the economic, social, and emotional well-being of her family. As an Arab-American woman, A.H. was also coping with and adopting to a new and alien culture. This could only have served to compound the stress and anxiety caused by F.H.'s involuntary absence from the family.
Despite this turmoil, the record supports the trial court's ultimate conclusion that both parents were unable to eliminate the harm endured by Harry, and did not provide a safe and stable home for him. We remain greatly concerned for Harry's health and safety, (and consequently, for *339 the health and safety of the other two children). We cannot ignore the fact that Harry has remained injury-free during the time he has been in foster placement.
As to Kathy's injuries, both DYFS and the Law Guardian conceded at oral argument before us that, standing alone, these injuries and the events surrounding them, would not constitute sufficient grounds to warrant the termination of F.H.'s and A.H.'s parental rights. The injuries themselves were nothing more than minor bruises (minor ear scratch; a scratch on the left hand; and a small bruise on the upper arm), caused by pinching and other such forms of corporal punishment inflicted primarily by the maternal grandmother. There is no strong evidence that A.H. herself was personally involved in administering this form of discipline.[7]
Viewed in the light least favorable to A.H., the evidence only suggests that she did not recognize the impropriety of this form of discipline, thus failing to protect Kathy from her grandmother's ill-advised childrearing methods. The grandmother's voluntary separation from the family (at A.H.'s request), coupled with A.H.'s full participation in DYFS-sponsored parenting classes, has rendered this concern, if not moot, significantly less problematic. Finally, F.H. cannot be held responsible for Kathy's injuries, because he was incarcerated during the time the maternal grandmother was around the children.
The record as to the youngest child, James, is significantly less compelling than the record pertaining to his siblings. There is absolutely no evidence that James was ever abused or neglected by his parents. We recognize, however, that under N.J.S.A. 9:6-8.46, "proof of the abuse or neglect of one child shall be admissible evidence on the issue of the abuse or neglect of any other child of . . . the parent. . . ."
The Supreme Court has recognized that the courts "need not wait to act until a child is actually irreparably impaired by parental inattention or neglect." DMH, supra, 161 N.J. at 383, 736 A.2d 1261. "However, as a part of its burden of proof, the State must still demonstrate by a preponderance of the competent, material and relevant evidence (N.J.S.A. 9:6-8.46b) the probability of present or future harm." N.J. Div. of Youth & Family Servs. v. S.S., 372 N.J.Super. 13, 24, 855 A.2d 8 (App.Div.2004), certif. denied, 182 N.J. 426, 866 A.2d 983 (2005).
In DMH, DYFS sought to terminate the parental rights of the children's biological father, alleging he was unfit to parent due to "his failure to provide any care and support for his children [resulting] in harm that endangered their welfare." DMH, supra, 161 N.J. at 377, 736 A.2d 1261. DYFS pressed forward with this claim, despite the fact that it found that the father had not "wilfully [forsaken the children]; he professed parental love for them and sporadically expressed interest in providing for them." Ibid.
The Supreme Court embraced DYFS's theory of culpability, finding that the father, through his inattentiveness, had abdicated his parental responsibilities, thus satisfying DYFS's burden of proof as to prongs (1) and (2) of N.J.S.A. 30:4C-15.1a. Specifically, the Court noted that:
[The father] shares in the responsibility and blame for the plight of his children. While the infant C.H. was living with her mother, the child suffered from neglect and instability, resulting in damage that remains with her to this day. During *340 this early period, [the father] was nearby, knew of the conditions under which his child was living, yet did not ameliorate them; he failed to acknowledge paternity until 1993. DYFS caseworkers visiting the house between 1991 and 1993 found the family to be living in an overcrowded apartment under "deplorable" conditions. When his children were at risk of being placed in foster care due to their mother's neglect, drug abuse, and homelessness, [the father] did not come forward to request that they be placed in his custody. Nor did [the father] assist in securing adequate housing or providing care for the children when they were still in the custody of [their mother]. Thus, he compounded the mother's neglect and contributed to the circumstances that required the eventual placement of the children in foster care. The instability and lack of adequate care that characterized the lives of these children did not improve, but in fact deteriorated, after [the father] acknowledged his paternity. Following the biological mother's death, [the father] did not provide the children with the emotional support and comfort or even the reassurance of physical presence that such a trauma would require of a parent. Instead, he failed even to visit the children for six months.
Each child has suffered. [The father], no less than [the mother], permitted C.H. to live unsupervised and unkempt in the shelter where DYFS had temporarily placed the family. DYFS eventually removed C.H. for lack of adequate supervision. C.H.'s special needs, a result of these experiences, are well documented in the record. These have been expressed in aggressive behavior, use of sexually explicit language beyond her years, and stealing. During the period after the initial hearing, C.H. required hospitalization due to angry and explosive actions at school. Dr. Wells, the initial expert, testified that C.H.'s problems are attributable in part to the unstable environment and inadequate living conditions she experienced during her first few years of life. We note that Dr. Nadelman, the second expert, confirmed this opinion, observing that C.H.'s emotional problems were the result of the "instability and turmoil" of her early life.
R.H. has been in foster care since shortly after his birth. [The father] did not protest R.H.'s placement in foster care, and did not express any parental interest until after the child had been voluntarily placed in foster care. Outside of occasional visits, [the father] has never provided R.H. with any paternal care, nurture, or support. R.H. was born with heroin in his system due to his mother's drug use during her pregnancy; that harm was compounded by [the father's] persistent failure to perform any parenting functions and to provide nurture, care, and support for R.H. for over three years. This constitutes a parental harm to that child arising out of the parental relationship. . . .
[Id. at 379-80, 736 A.2d 1261.]
Against this record, the Court concluded that DYFS had presented sufficient evidence of parental unfitness. More importantly, the Court also concluded that this record revealed the father's future inability "to provide his children with an adequately stable home." Id. at 380, 736 A.2d 1261. Thus, the Supreme Court's admonition in DMH that "courts need not wait to act until a child is actually irreparably impaired by parental inattention or neglect," must be understood, considered, and applied in the context of a clear record showing a pattern of parental inaction and neglect, amounting to unfitness.
*341 Applying this standard, we conclude that the trial court failed to make sufficient factual findings to warrant the termination of F.H.'s and A.H.'s parental rights with respect to James. In contrast to the facts in DMH, the record here with respect to James is devoid of any evidence that he was abused or neglected by his parents. Indeed, DYFS removed James from his parents' custody while F.H. was incarcerated.[8]
We are mindful that Harry's injuries may be viewed as a harbinger of what could befall James if he is left, unsupervised, in his parents' custody. As we noted in J. & E., supra, 157 N.J.Super. at 493, 385 A.2d 240:
Predictions as to probable future conduct can only be based upon past performance. . . . We cannot conceive that the Legislature intended to guarantee to parents at least one chance to kill or abuse each child. Evidence of parents' fitness or unfitness can be gleaned not only from their past treatment of the child in question but also from the quality of care to other children in their custody.
The record here, however, does not present a consistent pattern of egregious acts of abuse or neglect. The facts here are more nuanced. Even with respect to Harry, the parents' conduct here is heavily laden with the complexities and ambiguities of human behavior. On the one hand, Harry suffered from many medically unexplained fractures. On the other hand, this fact came to light when both F.H. and A.H. brought Harry to the attention of medical professionals.
Our conclusion that DYFS did not satisfy the first prong of N.J.S.A. 30:4C-15.1a as to Kathy and James is based, in part, on the fact that the safety and health of Harry were jeopardized by a particular and discrete form of neglect, i.e., failing to protect him from harm, resulting in numerous fractures. Because the pattern of Harry's neglect was limited to this single form of repetitive injury rather than being more pervasive and diffuse, we are satisfied that, in light of the absence of any evidence in the record of injury to Kathy and James, the concern we expressed in J. & E., for the safety of the other siblings is not warranted here.

B

Second Prong

Parents' Inability to Prevent Harm
The second statutory element of the best interests standard is aimed at "determining whether the parent has cured and overcome the initial harm that endangered the health, safety, or welfare of the child, and is able to continue a parental relationship without recurrent harm to the child." N.J.S.A. 30:4C-15.1a(2); K.H.O., supra, 161 N.J. at 348, 736 A.2d 1246. Alternatively, the State can show "that the parent is unable to provide a safe and stable home for the child and that the delay in securing permanency continues or adds to the child's harm." K.H.O., supra, 161 N.J. at 348, 736 A.2d 1246. "In other words, the issue becomes whether the parent can cease causing the child harm before any delay in *342 permanent placement becomes a harm in and of itself." A.G., supra, 344 N.J.Super. at 434, 782 A.2d 458.
We have discussed at length how Harry continued to experience serious, medically unexplained trauma while he was in his parents' custody. We are troubled, as was the trial judge, by the parents' steadfast refusal to acknowledge any responsibility for these injuries. Of particular concern, is the parents' insistence on attributing Harry's injuries to a medical disorder, even in the face of incontestable medical evidence to the contrary, or to the aggressive tendencies of his slightly older sister.
Neither parent was directly accused of having caused Harry's injuries. Rather, the Division's case was based on the parents' unwillingness to recognize that their parental role included providing a safe environment for all of their children, including Harry. We are satisfied that the record supports, through circumstantial evidence, the trial court's conclusion that the Division met its burden of proof as to Prong Two, but only with respect Harry.
"`[T]he cornerstone of the [best interest] inquiry is not whether the biological parents are fit but whether they can cease causing their child harm.'" S.A., supra, 382 N.J.Super. at 535, 889 A.2d 1120 (quoting J.C., supra, 129 N.J. at 10, 608 A.2d 1312).
The record is insufficient to show, however, that the parents' were unwilling or unable to eliminate any harm with respect to Kathy and James. First, there is no evidence that James was ever placed in an unsafe environment. As to Kathy, even assuming that she was placed in a harmful environment when the maternal grandmother was in the home, that risk was eliminated by A.H. There is no evidence that F.H. was ever abusive to his daughter, or that A.H. caused or permitted any serious harm to befall Kathy. Moreover, DYFS conceded at oral argument before us that the minor lacerations and bruises observed were insufficient, in and of themselves, to warrant termination of parental rights.

Third Prong

Services provided by DYFS
The third element requires DYFS to undertake "reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights." N.J.S.A. 30:4C-15.1a(3).
F.H. argues that the trial court failed to explore placement with his brother. A.H. contends that DYFS failed to offer testimony that the caseworker mailed the appropriate documents to her brother-in-law, or that any follow-up was done regarding placement of the children with him. She thus requests that we remand the case for consideration of the brother-in-law as an alternative placement even though that option was not "explicitly argue[d] on the record." The Division maintains that F.H.'s brother is not a viable option.
After reviewing the record, including F.H.'s testimony presented to the trial court after our remand, we are satisfied that DYFS correctly rejected this individual as an alternative placement for the children, including Harry. Because we conclude that termination is warranted here only with respect to Harry, we will focus our analysis on determining whether placing Harry with his paternal uncle is a reasonable alternative under the circumstances.
*343 We start our discussion of this question by noting that Harry is a developmentally delayed child with special needs. He has not fared well in foster placement, resulting in him being moved a number of times. It seems clear to us that what this child needs, in addition to love and nurturing, is stability. Given the testimony presented before the trial court, it is highly dubious that the paternal uncle will be able to provide Harry with the specialized care he needs on a permanent basis. This man candidly admitted that he has five children of his own that reasonably demand and receive a great deal of his attention. Despite his best intentions, his time and efforts will naturally be prioritized around the needs of his own children. Under such circumstances, we cannot conclude that the trial court erred in determining that he was not a viable alternative to termination.
It is "well established that it is the Division's policy to place children with relatives whenever possible." N.J. Div. of Youth and Family Servs. v. M.F., 357 N.J.Super. 515, 527, 815 A.2d 1029 (App. Div.2003). There is no presumption, however, in favor of placement with a relative as opposed to a third party. Id. at 528-29, 815 A.2d 1029.
We now turn to A.H.'s claims that the Division did not make reasonable efforts at reunification, by failing to provide home services or counseling to her on how to care for a physically-challenged child like Harry. N.J.S.A. 30:4C-15.1c defines the term "reasonable efforts" as
attempts by an agency authorized by the division to assist the parents in remedying the circumstances and conditions that led to the placement of the child and in reinforcing the family structure, including, but not limited to:
(1) consultation and cooperation with the parent in developing a plan for appropriate services;
(2) providing services that have been agreed upon, to the family, in order to further the goal of family reunification;
(3) informing the parent at appropriate intervals of the child's progress, development and health; and
(4) facilitating appropriate visitation.
N.J.A.C. 10:133I-4.2 sets forth guidelines, requiring that DYFS provide services to the family according to a case plan, including enlisting the assistance of relatives, providing services directly, or providing referrals to community service providers. DYFS must monitor these services, change them as needs arise, and identify and strive to overcome "barriers to service provision or service utilization." DMH, supra, 161 N.J. at 387, 736 A.2d 1261 (quoting N.J.A.C. 10:133I-4.2(b)(2)).
Our Supreme Court has also held that DYFS must encourage, foster and maintain the bond between the parent and child, promote and assist in visitation, keep the parent informed of the child's progress in foster care, and inform the parent of the necessary or appropriate measures he or she should pursue in order to continue and strengthen that relationship and, eventually, regain custody of his or her children. Id. at 390, 736 A.2d 1261. "The refusal to provide or allow an able and willing parent contact with her child is tantamount to a unilateral displacement of the biological parent, which is impermissible without judicial approval." Id. at 389, 736 A.2d 1261.
"Reasonable efforts" will vary depending upon the circumstances of the removal. A.G., supra, 344 N.J.Super. at 437, 782 A.2d 458. The failure or lack of success of such efforts does not foreclose a finding that the Division met its statutory burden to try to reunify the children with the family. DMH, supra, 161 N.J. at 393, 736 A.2d 1261; see K.H.O., supra, 161 N.J. *344 at 354, 736 A.2d 1246 (requirements satisfied where DYFS attempted to find relatives or friends who would care for the child, encouraged continued parental visits, informed the mother of the child's progress, monitored the mother's visits, and provided drug treatment programs).
Here, neither parent argues that the Division failed to keep them informed of the children's progress or that visitation was inadequate. Instead, both parents focused on the Division's effort in offering them services to facilitate reunification. It is undisputed that when first offered homemaker services, A.H. refused, with F.H.'s tacit approval. It is also undisputed that A.H. was offered and received both counseling and parenting classes.
F.H. was in prison from July 2002, and was still incarcerated in December 2003, when the Division changed its goal from reunification to termination. We have recognized "the difficulty and likely futility of providing services to a person in custody. . . ." S.A., supra, 382 N.J.Super. at 535-36, 889 A.2d 1120. Nonetheless, it was undisputed that the Division offered homemaker services to the family, provided supervised visitation and transportation services through several agencies after problems arose with F.H. and certain staff members, provided psychological and bonding evaluations for both parents and the children, medical evaluations for Harry, and therapeutic daycare for Kathy.
A.H. was the primary caretaker for the children. In this context, it was not unreasonable for the Division to focus its efforts on her. See DMH, supra, 161 N.J. at 393, 736 A.2d 1261 (where one parent has been primary or dominant in caring for the children, it was reasonable for DYFS to focus its efforts on that parent "so long as DYFS does not ignore or exclude" the other parent). Even if the Division had been deficient in the services offered to F.H., reversal would still not be warranted, because the best interests of the child controls. See In re Guardianship of J.R., 174 N.J.Super. 211, 221-25, 416 A.2d 62 (App. Div.) (DYFS's failure to fulfill statutory duty did not warrant reversal of decision terminating parental rights because best interest controlled), certif. denied, 85 N.J. 102, 425 A.2d 266 (1980).

Fourth Prong

Termination of Parental Rights Would Do More Harm than Good.
This prong requires DYFS to show that the termination of parental rights will not do more harm than good. N.J.S.A. 30:4C-15.1a(4). Here, A.H. argues that: (1) the record of visitations with the children does not support termination; and (2) no expert found that termination was in the children's best interest. As an alternative, A.H. proposes that the concerns raised by DYFS can be addressed by counseling. F.H. contends that the trial court's conclusion with respect to this prong was a "naked conclusion," without support in both law and fact.
The Division responds that a bonding assessment with the foster parents was not necessary in this case, because the parents were unwilling or unable to eliminate the risk of harm to the children, and the children needed permanency. The Law Guardian argues that the fourth prong was satisfied through evidence showing that the parents do not take any responsibility for the injuries suffered by Harry or Kathy.
In our view, the evidence presented by DYFS shows that Harry has not bonded with his current foster parents. Under the fourth prong, we must determine "whether, after considering and balancing the two relationships, the child will suffer a greater harm from the termination *345 of ties with [his or] her natural parents than from the permanent disruption of [his or] her relationship with [his or] her foster parents." K.H.O., supra, 161 N.J. at 355, 736 A.2d 1246. "This criterion is related to the first and second elements of the best interests standard, which also focus on parental harm to the children." DMH, supra, 161 N.J. at 384, 736 A.2d 1261. The child's need for permanency and stability emerges as a "central factor" in guardianship cases. K.H.O., supra, 161 N.J. at 357, 736 A.2d 1246. In fact, "[t]he trend over the last thirty years has been towards foster care reforms that place limits on the amount of time a parent may have to correct conditions at home in anticipation of reunification." Id. at 358, 736 A.2d 1246.
Here, there was very limited testimony as to the bond between Kathy, James and their foster mother. There was no testimony as to any bond between Harry and his then foster parents.[9] None of the experts opined that any of the children would suffer harm from being removed from their foster families. We thus conclude that the Division did not present "clear and convincing evidence that separating the [children] from [their] foster parents would cause serious and enduring emotional or psychological harm." J.C., supra, 129 N.J. at 19, 608 A.2d 1312. On the other hand, the record shows that both F.H. and A.H. have a strong emotional attachment to the children.
That being said, however, the statutory standards utilized to determine parental fitness "are neither discrete nor separate." N.J. Div. of Youth and Family Servs. v. F.M., 375 N.J.Super. 235, 258, 867 A.2d 499 (App.Div.2005). The history of unexplained serious trauma endured by Harry while in his parents' care, coupled with the parents' intractable refusal to acknowledge any responsibility for these injuries, creates a clear and compelling record warranting the termination of parental rights, even in the absence of evidence showing that Harry has bonded with his foster parents. Stated differently, permitting Harry to continue to reside with and be subject to his parents' jurisdiction, would cause greater harm than allowing him to remain in DYFS' custody pending a more suitable and permanent foster care placement.

VIII

Conclusion
We hold that the Division met its burden of proof that the parents were unwilling or unable to provide a safe and secure environment for Harry. The record shows that while in defendants' custody, Harry suffered multiple serious injuries that were not caused by any medical disorder. The record also shows that the parents' explanation for how these injuries occurred was not consistent with the medical evidence or with the force necessary to trigger the resulting mechanism of injury.
With respect to Kathy, there was insufficient evidence to support the trial court's holding that the parents caused or were otherwise responsible for causing significant physical or emotional injuries to her. Finally, with respect to James, there was no evidence showing that the parents caused or were otherwise responsible for *346 causing any physical or emotional injuries to him.
In this light, we (1) affirm the judgment of the Family Part terminating defendants' parental rights with respect to Harry; and (2) reverse the judgment of the Family Part terminating defendants' parental rights with respect to Kathy and James. We remand the matter to the Family Part to explore, at a permanency hearing, DYFS's capability to provide defendants with the services and supervision necessary to insure the health, welfare, and safety of Kathy and James. This permanency hearing must take place within thirty days from the date of the release of this opinion.
A precipitous reunification of Kathy and James with their parents would be both unwise and unwarranted. Rather, a carefully monitored, closely supervised, gradual increase in both the frequency and scope of the parents' contacts with these two children will provide the best means to achieve the desired goal: the eventual return of Kathy and James to their parents, without compromising the children's safety. If, after the passage of sufficient time to assess the efficacy of these services, the trial court is satisfied that reunification with respect to Kathy and James is no longer legally viable, DYFS may re-file its Guardianship Petition. At this juncture, the trial court must find sufficient evidence causally linking any incidents of abuse or neglect to specific acts or omissions committed by a particular parent. S.A., 382 N.J.Super. at 535, 889 A.2d 1120.
In order to sustain a judgment terminating a defendant's parental rights with respect to children who have not been the direct recipient of abuse or neglect, the trial court must find, by clear and convincing evidence, that DYFS has demonstrated that the parent's failure to adequately respond to and/or prevent the abuse endured by one child, exposes any similarly situated sibling to a high probability of being abused or neglected.
We are also mindful that the future of these three children remains unsettled. We recognize that our decision separates Harry from the rest of his family. In this sense, it seems that this child is being punished just for being the object of his parents' neglect. Under no circumstances, however, can we permit such a prospect to come to pass. No rational child-protection system can countenance such an outcome.
The Supreme Court recently considered the question of whether biological siblings who are adopted by separate families retain a legally cognizable right to visitation with each other, independent of the wishes of the their newly adoptive parents. N.J. Div. of Youth and Family Servs. v. S.S., 187 N.J. 556, 902 A.2d 215 (2006). In S.S.,
the Family Court terminated [the mother's] parental rights to her biological daughter, A.M.S. The Appellate Division affirmed, and [the mother] does not challenge the termination of her rights. At the time of A.M.S.'s birth, her four older siblings had been removed from [the mother's] home. As A.M.S. approaches her fourth birthday, she lives happily with the only family she has known her entire life, a foster family that loves and wishes to adopt her. Her four older siblings, now ages six, nine, thirteen, and sixteen, live with another family that has already adopted them. Through the cooperation and caring of those two families, A.M.S. has been able to visit and maintain a continuing relationship with her siblings.
[Id. at 558, 902 A.2d 215.]
In light of the families' voluntary cooperation with respect to contacts between siblings, the Supreme Court declined to decide the issue, concluding that the parties *347 had not presented a genuine controversy, because "the sibling relationship [was] not in jeopardy." Id. at 559, 902 A.2d 215. The Court noted, however, that the question of whether "a child has a constitutional right to visit with a brother or a sister who has been adopted by another family" has never been addressed by any court in this State. Id. at 563, 902 A.2d 215. Moreover, although noting the existence of a statutory framework that could potentially bear on the question, the Court expressly declined to decide the issue.

N.J.S.A. 9:2-7.1 provides the framework for grandparent and sibling visitation when visitation is proven to be "in the best interests of the child." N.J.S.A. 9:2-7.1(a). Significantly, however, this Court has held that a natural grandparent does not have a right of contact with grandchildren who have been adopted by a non-relative under the Visitation Statute. We declared in [In re Adoption of a Child by] W.P. & M.P., [163 N.J. 158, 748 A.2d 515 (2000)] that the New Jersey Adoption Act, N.J.S.A. 9:3-37 to -56, trumps the rights of grandparents, as defined in N.J.S.A. 9:2-7.1, reasoning that "the complete termination of the biological parents' rights" has "the logical effect of terminating a biological grandparent's right to visitation." W.P. & M.P., supra, 163 N.J. at 168, 748 A.2d 515. We never directly addressed whether the same analysis and outcome would apply to a sibling. In other words, we have not had occasion to consider whether the rights provided to siblings under the Child Placement Bill of Rights Act[10] [N.J.S.A. 9:6B-1 to -6] and the Visitation Statute are still viable after parental rights have been terminated and brothers and sisters have been adopted by separate families.
[Id. at 562-63, 902 A.2d 215 (internal citation omitted).]
Finally, after reviewing how other states have addressed the question, the Court concluded that, in the absence of a genuine controversy, the Legislature was better suited to address the issue. Id. at 566, 902 A.2d 215.
As in S.S., the issue of whether Harry, Kathy and James have a legally enforceable right to visit and otherwise remain in contact with each other is not properly before us. No party has briefed the issue, and it was not a part of the trial court's analysis. In fact, there is no record before us attesting whether, as in S.S., the families involved would be amenable to a voluntary visitation schedule.
Thus, although we hope that any future plans DYFS has for Harry will include a sibling-visitation component to provide that, as the years go by, Harry remains in meaningful contact with his "big sister" and "little brother," we cannot dictate such *348 a plan. The net effect of our decision is to enable Harry to be legally capable of being adopted by a caring and loving family. When this occurs, it will be up to his new parents to determine what is in his best interest, including whether or not to foster a relationship with his biological siblings. Although it seems clear to us that DYFS should make available to Harry the appropriate therapeutic services to insure that he knows that nothing he did caused him to be estranged from his siblings, the decision to accept or reject such services lies in Harry's future adoptive parents. We thus affirm the termination of defendants' parental rights with respect to Harry.
Finally, we reject defendants' arguments that the Division's actions undermined the children's religious and cultural rights to be raised as Muslims. A Judgment of Guardianship "permanently severs the relationship between children and their biological parents," including, by implication, the right to dictate a child's cultural and religious upbringing. In re Guardianship of J.P. and B.P., 180 N.J. 494, 505, 852 A.2d 1093 (2004). DYFS' mission, and its driving concern in these type of cases, is first and foremost the physical and emotional well-being of the children. Although the continuation of a child's cultural and religious traditions may be laudatory, it cannot guide a decision to remove or not to remove; to terminate or not to terminate; or to pass over an otherwise suitable foster placement.
DYFS shall retain custody of Kathy and James until otherwise ordered by the Family Part. We do not retain jurisdiction.
Affirmed in part, reversed in part, and remanded.
NOTES
[1] The names used for the children are fictitious, intended to protect and preserve their right to confidentiality.
[2] Poland Sequence is defined as "[a] unique pattern of one-sided malformations characterized by a defect of the chest (pectoralis) muscle on one side of the body and webbing of the fingers (cutaneous syndactyly) of the ipsilateral hand (the hand on the same side)." MEDICINENET.COM, http://www.medterms. com (search "Poland Sequence"; then follow hyperlink for "Poland Sequence") (last visited December 22, 2006).
[3] When questioned as to why they had used different hospitals for each visit, F.H. claimed that the pediatrician told him to go to Englewood for the first arm injury and then to Hackensack the second time because it was "much more equipped."
[4] Dr. Julia DeBellis, the medical director for the Audrey Hepburn Children's House, defined osteogenesis imperfecta as "a genetic disorder with impairment of proper production of collagen" which "leads to several clinical outcomes including bruising and fractures."
[5] Although F.H.'s counsel has referred to an expert medical report that had not been completed at the time of the remand hearing, the record before us does not include such a document.
[6] Perdomo also testified that after reviewing Harry's medical records, he did not believe that the injuries suffered by the child were the result of a medical disorder. We are troubled by this testimony. As a psychologist, Perdomo is not competent to offer an opinion on this subject. Perdomo's testimony in this respect should have played no role in the trial court's assessment of the Division's proofs.
[7] Although Kathy alleged that her mother spanked her as punishment for being disobedient, there was no corroborative physical evidence.
[8] Although no party to this action has raised this issue, we note that neither the length of F.H.'s incarceration, nor the nature of the underlying crime were pleaded by DYFS as factors that should have been considered by the trial court in determining whether F.H. "has failed to perform the regular and expected parental functions or [was] unable to perform the regular and expected parental functions" as defined in N.J.S.A. 9:3-46a. See In re Adoption of Children by L.A.S., 134 N.J. 127, 135-42, 631 A.2d 928 (1993); Div. of Youth and Family Servs. v. S.A., 382 N.J.Super. 525, 534, 889 A.2d 1120 (App.Div.2006).
[9] In its brief, the Division advised us that Harry was placed in yet another foster home after trial and that the "plan" has now changed to foster home adoption. The Law Guardian, however, states that the "children's foster mother wishes to adopt all three siblings together." On this record, it is unclear whether or not the children are together and whether her desire to adopt Harry will be effected by the inability to adopt Kathy and James.
[10] As noted by the Court in S.S., the Child Placement Bill of Rights Act provides, in relevant part:

A child placed outside his home shall have the following rights, consistent with the health, safety and physical and psychological welfare of the child and as appropriate to the individual circumstances of the child's physical or mental development:
* * * * * *
d. To the best efforts of the applicable department to place the child in the same setting with the child's sibling if the sibling is also being placed outside his home;
* * * * * *
f. To visit with the child's sibling on a regular basis and to otherwise maintain contact with the child's sibling if the child was separated from his sibling upon placement outside his home, including the provision or arrangement of transportation as necessary[.]
[N.J.S.A. 9:6B-4.]