# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4461-17T1

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

    Plaintiff-Respondent,

v.

S.L.H.,

    Defendant,

and

D.W.R.,

    Defendant-Appellant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF M.A.H.,

    a Minor.

_____

Argued May 14, 2019 – Decided June 3, 2019

Before Judges Yannotti, Gilson and Natali.

On appeal from Superior Court of New Jersey, Chancery Division, Family Part, Gloucester County, Docket No. FG-08-0064-17.

Anne E. Gowen, Designated Counsel, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Anne E. Gowen, on the briefs).

Erica L. Sharp, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Melissa H. Raksa, Assistant Attorney General, of counsel; Erica L. Sharp, on the brief).

Todd S. Wilson, Designated Counsel, argued the cause for minor (Joseph E. Krakora, Public Defender, Law Guardian, attorney; Todd S. Wilson, on the brief).

PER CURIAM

Defendant D.W.R. (David)[1] appeals from an April 9, 2018 Family Part order terminating his parental rights to his son, M.A.H. (Mark). The child's mother, S.L.H. (Sarah), whose parental rights were terminated during the same proceeding, has not appealed. We find no merit in David's appeal and affirm.

---

[1] We use fictitious names for D.W.R., S.L.H., M.A.H., and D.C., to protect their privacy and for ease of reference. See R. 1:38-3(d)(12).

## I.

Mark was born in May 2016. The next day, the Division of Child Protection and Permanency (Division) received a report from a hospital social worker that upon Mark's birth, Sarah tested positive for opiates and other controlled dangerous substances. As a result of Sarah's substance use, Mark suffered withdrawal symptoms and remained hospitalized for over ten days. Sarah informed a Division caseworker that she thought she knew the identity of Mark's biological father and would contact him. Shortly after being discharged from the hospital, Sarah was incarcerated at the Camden County Correctional Facility (CCCF) as a result of a parole violation.

On May 23, 2016, Mark was discharged from the hospital, removed from Sarah's care, and placed in a Division-approved resource home. Two days later, the Division filed a verified complaint under N.J.S.A. 9:6-8.30 (Title Nine) for Mark's custody, care, and supervision due to Sarah's incarceration, history of substance abuse before and during pregnancy, and her previous involvement with the Division. On May 25, 2016, the court granted the Division immediate custody of Mark, and also ordered Sarah to provide the Division with the identity of Mark's biological father.

A-4461-17T1

On May 31, 2016, a Division caseworker visited Sarah at the CCCF, and Sarah identified David as Mark's father. She also provided the phone number for "an aunt" who she believed would have David's contact information. A week later, the Division caseworker called the aunt, who reported that David was incarcerated in either Pittsburgh or Harrisburg, Pennsylvania.

At a June 28, 2016 court proceeding, the court continued Mark under the Division's custody, care, and supervision, and noted that the Division was in the process of identifying and contacting David. On July 5, 2016, a Division caseworker received a voicemail from an employee of the Pennsylvania Department of Corrections, informing the caseworker that David was incarcerated in Pennsylvania, but under a different surname. Thereafter, on August 4, 2016, the Division learned that David was transferred to the Pennsylvania State Correctional Institution at Graterford (Graterford), in Graterford, Pennsylvania.

A Division caseworker attempted to visit David at the prison on August 18, 2016, but was unsuccessful, as the facility had not yet "processed the paperwork" to include the caseworker on the prison's approved visitors list. Four days later, a Division caseworker spoke with David on the phone and informed him that the next court date in the Title Nine action was scheduled for

4

September 28, 2016. During that call, David agreed to take a paternity test, expressed his interest in obtaining custody of Mark, and stated that he was incarcerated for a probation violation, and expected to be released at the end of September 2016.

On August 31, 2016, David left a voicemail for a Division caseworker, advising that he was released from prison and residing in a halfway house in Philadelphia, Pennsylvania. Later that day, the caseworker met with David in Philadelphia and discussed his visitation with Mark. The caseworker again reminded David of the September 28, 2016 court date, and asked if he needed a bus pass, tokens, or other assistance to attend visits with Mark. After the Division arranged visitation, David had his first visit with Mark on September 16, 2016. David also attended the September 28, 2016 case management conference, when the court ordered him to complete a paternity test.[2]

David missed his scheduled visits with Mark on October 6 and 13, 2016. On October 14, 2016, a Division caseworker attempted to meet David at the halfway house where he was residing, but was informed by the staff that David had been missing for two weeks. Despite leaving multiple voicemails, the

---

[2] On November 11, 2016, David's paternity test results confirmed that he was Mark's biological father.

caseworker was unable to reach David by phone. On October 19, 2016, David called the caseworker and explained that he had a new phone number and was starting a new job. David missed his October 20, 2016 and October 27, 2016 visits with Mark. He also failed to attend the October 25, 2016 court date, claiming to the Division caseworker that he was at work.

On November 2, 2016, David called a Division caseworker and advised that he no longer resided at the halfway house. He also provided a new address, and confirmed his visit with Mark for the next day. However, David missed his November 3, 2016 visit with Mark, and a subsequent scheduled visit on November 10, 2016. On November 17, 2016, David arrived approximately one and one-half hours late for a pre-scheduled visit with Mark.

On November 21, 2016, a Division caseworker spoke with David's parole officer, who stated that David missed his last parole appointment and had a "history of running from parole" by changing his address and phone number. The next day, David missed yet another visit with Mark. After unsuccessful attempts to contact David telephonically, a Division caseworker called David's parole officer again on November 30, 2016. The parole officer advised that he was also unable to locate David, and accordingly issued a warrant for David's arrest for his failure to report to parole.

After missing his December 1, 2016 visit with Mark, David contacted the Division on December 2, 2016, and stated that he had no permanent address. David failed to contact the Division to confirm his December 8 and 15, 2016 visits with Mark, and those visits were cancelled.

On December 7, 2016, David provided a Division caseworker with the name of his cousin, D.C. (Denise), as a potential placement for Mark. Less than a week later, a caseworker contacted Denise to assess her interest in adopting Mark and explain the Interstate Compact for the Placement of Children (ICPC) process. Thereafter, on December 20, 2016, a Division caseworker met with Denise and her daughter, and conducted a home inspection. The caseworker observed no safety issues in the home and noted that the utilities were in good working order. David, however, failed to attend the scheduled home visit. That same day, the Division received a call from David's parole officer that David had been arrested and would be reincarcerated at Graterford. As a result, David missed his December 22 and 28, 2016 visits with Mark.

On January 6, 2017, a Division caseworker called David at Graterford. David informed the caseworker that he would be incarcerated for approximately six months. The caseworker advised David that the next court date in the Title

Nine action was scheduled for January 17, 2017, and that he had a psychological and parenting capacity evaluation scheduled in March 2017.

At the January 17, 2017 proceeding, the Division named David as a defendant due to his status as Mark's father, and the court assigned counsel. Significantly, the Division did not lodge any Title Nine allegations against him. The court issued an order that same day in which it determined that Sarah "abused or neglected" Mark, based on its findings that she used illegal substances during pregnancy and that Mark suffered withdrawal. The court also scheduled a permanency hearing for April 10, 2017.[3]

For the next three months, a Division caseworker unsuccessfully attempted to schedule visits at Graterford with David and Mark, but was repeatedly informed by a prison social worker that the Division's request to be included on the prison's visitors list had not yet been "processed" or "approved." On March 9, 2017, the caseworker was informed by the prison social worker that David was transferred to Pennsylvania State Correctional Institution at Chester (Chester) in Chester, Pennsylvania.

---

[3] The parties have not provided us with a copy of the transcript from the January 17, 2017 hearing.

A-4461-17T1

The next day, a Division caseworker spoke with David on the phone and David asked whether the Division was able to contact Denise. The caseworker informed David that the Division made several unsuccessful attempts to reach her, but that it would continue to try to make contact. The caseworker also discussed with David's prison counselor the process of scheduling "face to face visits" at the prison with David and Mark.

On March 30, 2017, a Division caseworker brought Mark to the prison for a non-contact visit. David had similar visits with Mark at the prison on April 20, 2017 and June 22, 2017, and they "played through the glass."

From January to March 2017, the Division repeatedly called Denise to assess her as a placement for Mark. After a Division caseworker left multiple voicemails for Denise, she eventually contacted the Division on March 29, 2017, and expressed interest in providing a relative resource home for Mark.

On April 10, 2017, the court conducted a permanency hearing. At that proceeding, the court approved the Division's permanency plan for "termination of parental rights followed by adoption." The court determined the Division's plan was appropriate because Sarah was not participating in services, "[Sarah] [was] missing . . . , [and] [David] [was] incarcerated out of state." Although

David's counsel was present, David did not appear at the hearing, as he remained incarcerated in Pennsylvania.

On May 15, 2017, the Division filed a complaint for guardianship of Mark. At a May 17, 2017 hearing, the court ordered Mark to continue under the care, custody, and supervision of the Division, and in his current resource placement, pending the outcome of the guardianship proceeding. The court noted that David was absent and still incarcerated in Pennsylvania. Further, the court scheduled the next court date for July 25, 2017.

At the July 25, 2017 proceeding, the court ordered David to participate in an evaluation by Linda R. Jeffrey, Ph.D., and attend a substance abuse assessment. The court also ordered David to contact the Division upon his release from incarceration. Although his counsel was present at the July 25 proceeding, David did not appear as he remained incarcerated.

On August 29, 2017, Dr. Jeffrey conducted a bonding evaluation "[t]o assess the attachment of [Mark] to his resource home parents." Both resource parents expressed their desire to adopt Mark, as they considered him their son since he was placed in their care on May 23, 2016. Dr. Jeffrey observed that "[Mark] displayed secure attachment to each of his resource parents." Dr. Jeffrey concluded that "[s]everance of a secure attachment is likely to place a

10

child of [Mark's] age at risk for serious and enduring harm and to disrupt his adjustment in multiple domains of development." Accordingly, she recommended Mark remain in the resource parents' care, "where he presents as flourishing."

On September 11, 2017, David called a Division caseworker and advised that he would be released on September 20, 2017. After his release, Dr. Jeffrey conducted a psychological evaluation on September 29, 2017, "[t]o assess [David's] mental health status and parenting capacity." David reported that he resided in a halfway house and planned for Mark to live with Denise and her daughter if he was granted custody. Dr. Jeffrey diagnosed David with a parent-child relational problem, chronic and severe adjustment disorder, and mixed personality with narcissistic, antisocial, and dependent personality features.

Dr. Jeffrey also concluded that David was unprepared to: 1) "provide a stable, secure parenting environment for [Mark]"; 2) "provide independent housing or a steady income to support [Mark]"; and 3) "serve as an appropriate role model for [Mark] of emotional maturity, attunement, empathy, rule-governed behavior, and personal responsibility." Dr. Jeffrey also determined that Mark "would be likely to be at risk for harm if placed in [David's] care."

11

Dr. Jeffrey conducted a second bonding evaluation "[t]o assess the attachment of [Mark] to [David]." She observed that David's "reunification plan is to rely upon [Denise] and other relatives for housing and 'a very stable home' provided by others." Dr. Jeffrey concluded that Mark "related to [David] as a pleasant visitor and playmate." She added that "[Mark] did not relate to [David] as a secure base, a source of reliable and consistent stability and security, or as a parenting authority." Dr. Jeffrey determined that David "is not prepared to provide a minimal level of safe parenting for [Mark]."

On October 2, 2017, David appeared with counsel at a case management conference where the court ordered him to attend a substance abuse assessment and parenting skills classes. Three days later, David had a one-hour-long supervised visit with Mark at the Division office. Thereafter, David visited with Mark, usually once a week.

In March 2018, the court conducted a one-day trial on the Division's guardianship complaint. At trial, the Division relied on documentary evidence and the testimony of Stephanie Long, a Division caseworker assigned to Mark's case, and Dr. Jeffrey, who was qualified as an expert in clinical and forensic psychology. David testified, but he failed to proffer any expert opinion or documentary evidence. The Law Guardian presented no witnesses or other

evidence. The court issued an oral decision on April 4, 2018 that terminated David's parental rights, and issued a conforming judgment on April 9, 2018. This appeal followed.

On appeal, David argues that the Division failed to establish all four prongs of the "best interests of the child test" under N.J.S.A. 30:4C-15.1(a) by clear and convincing evidence. David also claims he was denied a fair hearing based upon the ineffective assistance of his trial counsel. For the reasons that follow, we disagree with each of David's arguments, and affirm.

II.

As to David's first point, because all of the trial judge's findings were supported by evidence the judge found to be clear, convincing, and credible, they are entitled to our deference. N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 448-49 (2012); Cesare v. Cesare, 154 N.J. 394, 413 (1998).

Parents have a constitutionally protected right to the care, custody and control of their children. Santosky v. Kramer, 455 U.S. 745, 753 (1982); In re Guardianship of K.H.O., 161 N.J. 337, 346 (1999). The right to have a parental relationship, however, is not absolute. N.J. Div. of Youth & Family Servs. v. R.G., 217 N.J. 527, 553 (2014); N.J. Div. of Youth & Family Servs. v. A.W., 103 N.J. 591, 599 (1986). At times, a parent's interest must yield to the State's

13

obligation to protect children from harm.  N.J. Div. of Youth & Family Servs. v. G.M., 198 N.J. 382, 397 (2009); In re Guardianship of J.C., 129 N.J. 1, 10 (1992).

To effectuate these concerns, the Legislature codified the test for determining when a parent's rights must be terminated in a child's best interests. N.J.S.A. 30:4C-15.1(a) requires that the Division prove by clear and convincing evidence the following four prongs:

> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child;
>
> (3) The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and
>
> (4) Termination of parental rights will not do more harm than good.

See also A.W., 103 N.J. at 604-11.

A.   Prong One

David first argues that the Division failed to show by clear and convincing evidence that he harmed Mark, or will continue to harm him, and maintains the court improperly based its prong one findings on his struggle to obtain employment and housing.  He further contends there was no evidence he "was able but chose not to secure independent housing and an adequate . . . job."  We disagree with David's arguments because the court's prong one findings are supported by substantial, credible evidence in the record.

The court determined that David's incarceration rendered him unavailable to care for Mark, and characterized the case as the "slow walking neglect of a child."  Under the first prong, harm to the child "must be one that threatens the child's health and will likely have continuing deleterious effects on the child."  K.H.O., 161 N.J. at 352.  In addition to physical abuse and neglect, the mental and emotional health of a child should be considered.  A.W., 103 N.J. at 604-05.  In this regard, a parent's failure to provide a safe and stable permanent home may establish harm under prong one.  In re Guardianship of D.M.H., 161 N.J. 365, 383 (1999).  Further, "[c]ourts need not wait to act until a child is actually irreparably impaired by parental inattention or neglect."  Ibid.  "[T]he focus is on the effect of harms arising from the parent-child relationship over time on

15

the child's health and development." K.H.O., 161 N.J. at 348. Accordingly, "[i]ncarceration is . . . probative of whether the parent is incapable of properly caring for . . . or has abandoned the child." R.G., 217 N.J. at 554-555 (quoting In re Adoption of Children by L.A.S., 134 N.J. 127, 136 (1993)).

Here, David was incarcerated when Mark was born. Although he was released approximately three months later, he was reincarcerated within four months, due to a parole violation. As a result, David was unavailable to care for Mark, provide the necessary emotional and physical support during the first sixteen months of Mark's life, and bond with him. During that period, Mark bonded with his resource parent, and as the unrebutted trial testimony from Dr. Jeffrey established, separating Mark from his resource parents would cause serious and enduring psychological harm.[4]

Even when not incarcerated, David failed to attend at least nine scheduled visits with Mark, and was late for at least one other. He also failed to maintain

_____

[4] We acknowledge that that although incarceration alone is insufficient to establish parental unfitness, "particularized evidence of how a parent's incarceration affects each prong of the best-interests-of-the-child standard" can support termination of parental rights. R.G., 217 N.J. at 556. Here, the court did not terminate Mark's parental rights solely because David was previously incarcerated. To the contrary, the court correctly noted David's unavailability at Mark's birth and immediately beforehand, when Sarah was using drugs while pregnant. David's inability to care for Mark, and his withholding of solicitude from him, supports the court's prong one and two findings.

a permanent, stable home, instead moving from address to address, without properly advising his parole officer, or the Division.  As Dr. Jeffrey concluded, David was "not prepared to provide a stable, secure parenting environment for [Mark]."

Finally, we disagree with David's assertion that the court's conclusions were based on his economic circumstances.  As noted, there is substantial, credible evidence in the record, independent of David's financial situation, such as the harm caused to Mark as a result of his repeated incarcerations and his failure to consistently attend visits once released, to support the court's finding that Mark's "safety, health, or development" has been, and will continue to be, endangered by a continued relationship with David.  See N.J.S.A. 30:4C-15.1(a)(1).

B.    Prong Two

With respect to prong two, David primarily contends that the court incorrectly relied on Dr. Jeffrey's evaluation when it concluded he would be unable to mitigate the harm Mark would face if separated from his resource parents.  We disagree.

The second prong relates to parental unfitness and "focuses on the parent's ability to overcome the harm to the child."  K.H.O., 161 N.J. 352.  The findings

under the first prong overlap with the second.  See R.L., 388 N.J. Super. at 88. A "pattern of parental inaction and neglect" may demonstrate parental unfitness. N.J. Div. of Youth & Family Servs. v. F.H., 389 N.J. Super. 576, 615 (App. Div. 2007).  A court "should only determine whether it is reasonably foreseeable that the parents can cease to inflict harm upon the children entrusted to their care." A.W., 103 N.J. at 607.

As noted, after his release, David failed to consistently visit Mark or maintain a stable residence.  Instead, he elected to violate his parole resulting in his reincarceration.  As the court explained, David "knew he had a baby and the stakes were so much higher than his own freedom or future plans for independence at the age of [fifty-two]."  In addition, according to Dr. Jeffrey's evaluation, David was unprepared to "provide a stable, secure parenting environment[,] . . . independent housing[,] or a steady income to support [Mark]."  Dr. Jeffrey testified that David was unable to understand or properly address the harm that Mark would face if separated from his resource parents, who he had been with since he was less than two weeks old.  She also concluded that David showed a lack of motivation to change his behaviors.

C.    Prong Three

David next asserts the Division failed to make "reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home." N.J.S.A. 30:4C-15.1(a)(3). Specifically, David maintains the Division failed to offer him financial assistance, help him obtain employment, and pay the first month's rent and security deposit for an apartment. He further contends that his one-hour supervised visitation with Mark was "paltry," and that the Division should have provided him with longer, unsupervised visits. Again, we are unpersuaded by these arguments.

With respect to the third prong, reasonable efforts include: "consultation and cooperation with the parent in developing a plan for appropriate services; . . . providing services that have been agreed upon, to the family, in order to further the goal of family reunifications; . . . and facilitating appropriate visitation." N.J.S.A. 30:4C-15.1(c). "The diligence of [the Division's] efforts on behalf of a parent is not measured by their success." D.M.H., 161 N.J. at 393. Instead, the Division's "consistent efforts to maintain and support the parent-child bond are central to the court's determination." Ibid.

The court concluded that "the Division made very reasonable efforts to work with [David] on reunification." For example, the court explained that

19

while the Division's "work[] with the . . . ICPC . . . may not have been perfect," it was reasonable. Further, the court noted that the Division brought Mark to the prison for visits, and facilitated weekly supervised visits. Additionally, the court found Kinship Legal Guardianship (KLG) was not an appropriate permanency plan, as the resource parents wished to adopt Mark.[5]

Here, the Division provided substance abuse assessments and parenting skills classes to David, reasonably worked with the ICPC to assess Denise, and offered David weekly, one-hour-long supervised visits with Mark. As noted, when David was first released from prison in August 2016, he failed to attend these visits numerous times.

The Division nevertheless provided David with visits after his reincarceration by bringing Mark to the prison. When the prison informed the Division that the caseworker was not yet an approved visitor, the Division consistently remained in contact with the prison to facilitate the necessary approvals. Additionally, when David was released again in September 2017, the Division offered him transportation, so that he could attend weekly visits. Due to David's incarceration since before Mark's birth, it was entirely reasonable

---

[5] We note that David has not challenged the court's finding under N.J.S.A. 20:4C-15.1(a)(3) that the Division "has considered alternatives to termination of parental rights."

for the Division to offer weekly supervised visits, rather than unsupervised visits.

Finally, as noted, Dr. Jeffrey provided unrebutted expert testimony which included the opinion that David lacked the motivation to change his behavior. Based on the trial record, we are satisfied that the court correctly determined that the Division clearly and convincingly satisfied prong three, and we reject David's claims that additional services, including financial assistance or longer, unsupervised visitation with Mark, would have "corrected the circumstances which led to the [Mark's] placement outside the home." N.J.S.A. 30:4C-15.1(a)(3).

D.    Prong Four

The final prong of the statutory best interests test assesses whether "[t]ermination of parental rights will not do more harm than good" to the child. N.J.S.A. 30:4C-15.1(a)(4). The fourth prong "serves as a fail-safe against termination even where the remaining standards have been met." N.J. Div. of Youth & Family Servs. v. G.L., 191 N.J. 596, 609 (2007). The question to be addressed "is whether, after considering and balancing the two relationships, the child will suffer a greater harm from the termination of ties with her natural parents than from the permanent disruption of her relationship with her foster

parents." K.H.O., 161 N.J. at 355. To satisfy this prong, the State should present a "well qualified expert who has had [a] full opportunity to make a comprehensive, objective, and informed evaluation of the child's relationship with both the natural parents and the [resource] parent[]." N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 281 (2007) (citations and internal quotation marks omitted).

As Dr. Jeffrey testified, David failed to recognize "any problems that [Mark] would have being removed from [the resource home] where he had lived for a considerable portion of his infancy and adjusting to an entirely new environment." She also stated that Mark "did not relate to [David] as a secure base, a source of reliable and consistent stability and security, or as a parenting authority," and "would be likely to be placed at risk for harm because of the lack of parenting capacity that [David] has achieved." With respect to Mark's resource parents, Dr. Jeffrey testified that Mark "has a secure attachment" to them, and Mark would suffer serious and enduring harm if the attachment was severed. Dr. Jeffrey's testimony provides ample support for the court's finding that Mark's best interests were served by terminating David's parental rights to allow for his adoption by his resource parents.

22

Finally, David maintains we should reverse the court's April 9, 2018 order because his trial counsel was ineffective. Specifically, he claims his counsel failed to: 1) locate and communicate with him during the Title Nine litigation and guardianship proceedings; 2) request that he be produced in court, either in person, video, or telephonically, while he was incarcerated; 3) convince the court to place Mark with Denise, rather than the resource family; and 4) prevent his reincarceration for his parole violation. We disagree with all of Mark's arguments.

In N.J. Div. of Youth & Family Servs. v. B.R., 192 N.J. 301, 305-07 (2007), our Supreme Court adopted the two-prong test established in Strickland v. Washington, 466 U.S. 668 (1984), and State v. Fritz, 105 N.J. 42 (1987), for evaluating ineffective assistance of counsel claims in termination of parental rights matters. A defendant alleging ineffective assistance of counsel must prove:

> (1) counsel's performance must be objectively deficient – i.e., it must fall outside the broad range of professionally acceptable performance; and
>
> (2) counsel's deficient performance must prejudice the defense – i.e., there must be "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."

> [B.R., 192 N.J. at 307 (quoting Strickland, 466 U.S. at 694).]

The standard is "highly deferential," and "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance . . . ." Ibid. In other words, a defendant must "overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." Id. at 307-08 (quoting Strickland, 466 U.S. at 689). "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable[.]" Strickland, 466 U.S. at 690.

Based on the record before us, there was no showing that counsel's representation was "objectively deficient." It is undisputed that David's counsel appeared in court on his behalf from the time she was appointed at the Title Nine fact-finding proceeding in January 2017. While the record does not explain why David's counsel failed to contact him during the early stages of the Title Nine proceedings, or arrange for his appearance by video or telephone, we are satisfied that David's interests were adequately represented at all critical stages of the proceedings. In this regard, we note that the Division did not allege David committed any Title Nine violations, and named him in that proceeding only because he was Mark's biological father. We also observe that David was aware

24

of the October 25, 2016 proceeding in the Title Nine action and failed to attend, despite the fact that he was not incarcerated at the time.

During the guardianship proceedings, counsel appeared on David's behalf, and David appeared at the October 2, 2017 case management conference. At trial, his counsel cross-examined Stephanie Long and Dr. Jeffrey, objected to the resource mother's presence at trial, and presented David as a fact witness.

We also reject David's suggestion that his counsel's actions, or inactions, had any role in his arrest for a parole violation. Rather, a warrant was issued for David's arrest as a result of his failure to properly inform his parole officer of his address.

We similarly reject David's speculative claim that effective counsel would have addressed the ICPC process differently. According to David, his counsel should have advised Denise to promptly respond to Division caseworkers' calls, facilitated contact between the ICPC staff and Division caseworkers, informally advocated with Pennsylvania's ICPC administrator, and encouraged contact between Denise and Mark. The Division repeatedly contacted Denise, despite her failure to respond to multiple voicemails, conducted a home assessment, and explained to her how the ICPC process works. There is no support in the record that counsel's performance was deficient, or that any hypothetical action taken

by counsel would have affected how the Division addressed Denise as a potential resource placement.

Moreover, David fails to establish that any deficiency prejudiced him. Indeed, there was substantial, credible evidence, unrebutted by David (i.e., the effect of David's incarceration on Mark, and Dr. Jeffrey's testimony), supporting each of the N.J.S.A. 30:4C-15.1(a) prongs.

We also disagree with David's assertion that we should presume prejudice under United States v. Cronic, 466 U.S. 648 (1984). In Cronic, the Supreme Court described a narrow exception to the Strickland test, where "if [an] accused is denied counsel at a critical stage of his trial," or "if counsel entirely fails to subject the prosecution's case to meaningful adversarial testing," prejudice to the accused is presumed. Id. at 659. However, "[r]eversals following Cronic have arisen only from . . . significant impairments of adequate representation . . . ." Fritz, 105 N.J. at 62 (listing cases in which a presumption of prejudice under Cronic was appropriate); see Gov't of Virgin Islands v. Zepp, 748 F.2d 123 (3rd Cir. 1984) (concluding presumption of prejudice was proper where defendant's counsel was a prosecution witness and potentially liable for the same criminal charges on which defendant was tried). "[T]he attorney's failure must be complete." Bell v. Cone, 535 U.S. 685, 697 (2002).

The narrow <u>Cronic</u> exception does not apply here. As noted, our Supreme Court in <u>B.R.</u> established the two-part <u>Strickland</u> test to evaluate ineffective assistance of counsel claims in termination of parental rights proceedings. <u>B.R.</u>, 192 N.J. at 305-07. Further, <u>Cronic</u> is inapplicable because David failed to demonstrate that he was denied counsel at critical stages of the proceedings. Indeed, as noted, counsel was present at the permanency hearing, and during the entire guardianship proceeding, including trial. Finally, David has not established that his counsel failed to subject the Division's case to "adversarial testing."

To the extent not addressed, David's remaining arguments lack sufficient merit to warrant discussion in a written opinion. <u>R.</u> 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-4461-17T1