# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5172-17T3

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

B.T.W.,

     Defendant-Appellant,

and

S.E.F.,

     Defendant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF B.L.W.
and M.U.W.,

     Minors.

_____

Submitted August 13, 2019 – Decided August 20, 2019

Before Judges Messano and Natali.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Cumberland County, Docket No. FG-06-0020-16.

Joseph E. Krakora, Public Defender, attorney for appellant (Robyn A. Veasey, Deputy Public Defender, of counsel; Albert Manuel Afonso, Designated Counsel, on the brief).

Gurbir S. Grewal, Attorney General, attorney for respondent (Donna Sue Arons, Assistant Attorney General, of counsel; Katrina Alicia Sansalone, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minors (Margo E.K. Hirsch, Designated Counsel, on the brief).

PER CURIAM

B.T.W. (Bobby) appeals from the termination of his parental rights to his daughters, B.L.W. (Blair), who was born in 2012, and M.U.W. (Megan) born in 2014.[1] The children's mother, S.E.F. (Sara), executed a general surrender of her parental rights and is not a party to this appeal.

I.

The Division of Child Protection and Permanency (Division) became involved with the family upon Blair's birth due to their concerns about Sara's

---

[1] We use fictitious names for B.T.W, B.L.W, M.U.W, and S.E.F., to protect their privacy and for ease of reference. See R. 1:38-3(d)(12).

"long history with the Division as a child" and domestic violence between her and Bobby. When the Division opened the case for services, Bobby was on probation and had an extensive criminal history including domestic violence, as well as weapons and drug offenses. The Division implemented a Safety Protection Plan (SPP), agreed to by Bobby, which required him to be supervised by a relative when in Blair's presence. At the time, Sara and Blair lived with Sara's mother.

Based on its concerns regarding Sara's history with the Division, Bobby's substance abuse, and the domestic violence history between Bobby and Sara, the Division subsequently filed a complaint under Title Thirty for the care and supervision of Blair on July 25, 2012. The court ordered that Blair be placed in the Division's care, and also ordered that Sara participate in domestic violence counseling, family preservation services, and a psychological evaluation. Bobby, who was incarcerated at the time, was also ordered to comply with domestic violence counseling and attend a psychological evaluation.

Bobby was released from jail in September 2012, but was re-incarcerated approximately two months later for a domestic violence incident with Sara in October 2012. During his brief release, Bobby made no contact with the

3

Division to arrange for visitation with Blair, and he failed to appear for two scheduled substance abuse evaluations.

In April 2013, Bobby underwent a substance abuse evaluation and was referred for intensive outpatient care. Thereafter, a counselor from the Center for Family Services made multiple unsuccessful attempts to get in touch with Bobby to schedule an intake appointment. A month later, Bobby attended his intake appointment, and later attended a group session, but his subsequent attendance was sporadic.

Bobby submitted to a psychological evaluation with Gregory C. Gambone, Ph.D. Dr. Gambone's recommendations included that Bobby participate in a psychiatric evaluation, another substance abuse evaluation, domestic violence training, and parenting skills training.

In May 2013, Bobby and Sara were involved in another domestic violence incident. Bobby reported to a Division caseworker that Blair was present during the incident. Three months later, a caseworker met with Bobby, who reported that he did not have a stable residence. Bobby also stated that he was focused on completing his recommended services, and wanted to visit Blair once the court's visitation restrictions were lifted.

A-5172-17T3

In April 2014, Megan was born.  Approximately, three months later, on July 23, 2014, the court terminated the Title Thirty litigation, finding that although "both parents could benefit from . . . services, neither appear to be willing to comply and the situation is such that is does not currently warrant a removal."  The court ordered, however, that Bobby be restrained from the children's home, and stated that Sara was "not an approved supervisor of his contact with [Blair]."

Five days later, the Division received a report that Sara allowed Bobby to keep Blair and Megan overnight, and failed to return with them the following day.  During its investigation, the Division also discovered that Sara and Bobby were with the children on two occasions that resulted in police involvement.  Accordingly, the Division removed the children from Sara's care and placed them in a resource home, where they still remain.

After a July 31, 2014 hearing, the court determined that the removal of Blair and Megan from Sara's care was required because "the court ordered restriction on [Bobby's] contact with the children was violated and there is ongoing domestic violence between the parents."  The court also ordered Bobby to attend an updated psychological evaluation and substance evaluation, submit to random urine screens, meet with a domestic violence liaison, and comply with

5

all recommendations. A Division caseworker spoke with Bobby after the hearing to discuss the court ordered services. Bobby informed the caseworker that marijuana and PCP were his drugs of choice, and that he had begun intensive outpatient care.

The Division scheduled weekly supervised visits with the children, but Bobby missed all but one visit in August 2014. Additionally, the Division repeatedly made unsuccessful attempts to contact Bobby by phone. That month, Bobby was arrested on drug charges, and remained incarcerated until approximately September 2017. After his arrest, a Division caseworker met with him at the Cape May County jail, and Bobby stated that "he stopped using drugs but was still selling drugs." At another visit to the jail a caseworker explained to Bobby the importance to engaging in counseling and education while in prison.

In April 2015, Blair and Megan were returned to Sara's care. One month later, however, the Division conducted an emergency removal and placed the children with their previous resource parents after they were notified that Sara was homeless.

The court subsequently approved the Division's permanency plan of termination of parental rights, followed by adoption. The court determined that

the Division "provided reasonable efforts" towards reunification "including . . . [i]ndividual counseling, domestic violence services, psychological evaluation, supervised visitation, and in home parenting." On October 27, 2015, the Division filed a complaint for guardianship.

That same month, the Division contacted Bobby's correctional facility to ensure that Bobby was able to receive substance abuse services and domestic violence counseling while in prison. The Division also made attempts to arrange for "video visits" with Bobby and the children. Two months later, a Division caseworker met with Bobby at the correctional facility and furnished him with a court order and case plan, informed him of an upcoming court date, and provided him with the dates of his upcoming psychological and bonding evaluations. The caseworker also obtained the names of Bobby's prison social workers in order to obtain proof that he completed substance abuse treatment.

Thereafter, James L. Loving, Psy.D, conducted a bonding evaluation between Blair and Megan and their resource parents. Dr. Loving observed that the children were smiling, and Blair sat close to the resource parents, frequently calling them "Mommy and Daddy." Dr. Loving noted that their interactions conveyed "a sense of familiarity, comfort, and enjoyment." Based on the evaluation, Dr. Loving concluded "both girls have developed strong and mostly

7

positive attachments to [their resource parents]." He determined that "removing the sisters from their current [resource] home would place them at very high risk of serious and enduring harm."

Three months later, Bobby was transported from prison to submit to a psychological evaluation conducted by Dr. Loving. Dr. Loving concluded that Bobby "pose[d] severe risks in his role as a parent," presented a high risk of "re-arrest and re-incarceration," and "has a significant history of domestic violence." Dr. Loving observed that Bobby "has shown very little willingness or ability to change his behavior for the better." Dr. Loving also noted Bobby's history of substance abuse, lack of housing stability, and absence from his children's lives. Based on these findings, Dr. Loving "strongly support[ed] the Division's goal of adoption" by their resource parents, as it "would give both girls the best change to enjoy physical safety, stability, and emotional health . . . ." Dr. Loving noted that Blair and Megan "have already been in placement for an extended period of time, and they need to experience a sense of permanency as soon as possible, or else they will be at increasingly high risk for permanent emotional harm."

Dr. Loving also attempted to conduct a bonding evaluation between Bobby and the children on the same date. Blair and Megan, however, became

distressed and refused to participate in the evaluation with Bobby. Dr. Loving concluded that the children "experience little or no attachment with [Bobby]."

Bobby was transferred to a facility similar to a halfway house to complete his sentence. While there, he participated in a substance abuse screening, and was diagnosed with mild substance abuse disorder. Additionally, the facility evaluated Bobby's risk of recidivism as "high-medium." The Division contacted Bobby's social workers at the facility to receive information on Bobby's participation in services.

The Law Guardian arranged for a bonding evaluation of Bobby, Sara, and the children, to be conducted by Linda R. Jeffrey, Ph.D. Bobby did not attend the scheduled evaluations. The appointment with Dr. Jeffrey was accordingly rescheduled, and Bobby again failed to attend.

Thereafter, Dr. Jeffrey conducted a bonding evaluation of the children and their resource parents at the Law Guardian's request. Dr. Jeffrey observed that Blair and Megan "displayed pleasure when they saw the resource home parents," and "maintained close proximity to them." Based on her evaluation, Dr. Jeffrey concluded that the children "displayed a secure attachment to each of their resource home parents," and "[s]everance . . . of a secure attachment is likely to

place a child at risk for serious and enduring harm." Dr. Jeffrey recommended that Blair and Megan remain in their resource parents' care.

The Division continued to provide Bobby with supervised visitation, despite Blair's statement during an individual therapy session that she did not want Bobby to attend visits with her. In November 2017, the Division referred Bobby and Sara to Families Matter for therapeutic supervised visitation with the children. At a subsequent visit, Megan got upset and began to hit and kick Bobby. Families Matter reported that the children had difficulty transitioning when the resource parents left at the beginning of each visit, and that the children "spit, kick, hit, and throw things in [Bobby's] face."

On April 13, 2018, Bobby was again arrested for possession and distribution of marijuana, heroin, cocaine, PCP, and synthetic cannabinoid, as well as possession of drug paraphernalia and endangering the welfare of a child.

The guardianship trial began approximately one month later. In addition to documentary evidence, the Division presented the testimony of the Division caseworker Taneka Singleton and expert psychological testimony from Dr. Loving. The Law Guardian proffered Dr. Jeffrey, an expert in forensic psychology. The court concluded all these witnesses testified credibly. Bobby did not testify, present any fact or expert witnesses, or documentary evidence.

A-5172-17T3

On the last day of trial, the court accepted Sara's general surrender of her parental rights, and entered a judgment of guardianship terminating Bobby's parental rights to Blair and Megan.

II.

Bobby argues on appeal that the Division failed to prove prongs three and four of the "best interests of the child" test under N.J.S.A. 30:4C-15.1(a) by clear and convincing evidence. The Law Guardian supported termination in the trial court and joins the Division in urging us to affirm.

With respect to prong three, Bobby maintains that the Division did not make "reasonable efforts to provide services" while he was incarcerated to help him correct the circumstances that led to Blair's and Megan's removal and placement with their resource family. He further asserts that the Division's efforts to "foster[] the parental relationship were fatally deficient" during his extended periods of incarceration which resulted in the lack of a formative bond between Bobby and his children. As to prong four, Bobby similarly claims that the Division's failure to foster his parental relationship resulted "in the inevitable outcome that the children were only bonded to their [resource] parents," and as a result, the Division did not establish by clear and convincing evidence that

11

termination of his parental rights "will not do more harm than good."  N.J.S.A. 30:4C-15.1(a)(4).[2]

We reject Bobby's arguments and affirm substantially for the reasons set forth by Judge Michael R. Ostrowski, Jr., in his comprehensive and well-reasoned oral opinion issued at the conclusion of the five-day guardianship trial.  All of the judge's findings are supported by substantial, credible evidence and, therefore, are entitled to our deference.  N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 448-49 (2012); Cesare v. Cesare, 154 N.J. 394, 413 (1998).  We add the following comments.

### III.

Parents have a constitutionally protected right to the care, custody, and control of their children.  Santosky v. Kramer, 455 U.S. 745, 753 (1982).  "The rights to conceive and to raise one's children have been deemed 'essential,' 'basic civil rights . . . ,' and 'rights far more precious . . . than property rights.'"  Stanley v. Illinois, 405 U.S. 645, 651 (1972) (citations omitted).  "[T]he preservation and

---

[2] On appeal, Bobby has not argued that the Division failed to establish prongs one and two of N.J.S.A. 30:4C-15.1(a).  Nor has he challenged the court's finding under N.J.S.A. 30:4C-15.1(a)(3) that the Division "considered alternatives to termination of parental rights."  We have nevertheless independently reviewed the record and are satisfied that the Division clearly and convincingly satisfied those statutory elements as well.

A-5172-17T3

strengthening of family life is a matter of public concern as being in the interests of the general welfare . . . ." N.J.S.A. 30:4C-1(a); see also In re Guardianship of K.H.O., 161 N.J. 337, 347 (1999).

The constitutional right to the parental relationship, however, is not absolute. N.J. Div. of Youth & Family Servs. v. A.W., 103 N.J. 591, 599 (1986). At times, a parent's interest must yield to the State's obligation to protect children from harm. In re Guardianship of J.C., 129 N.J. 1, 10 (1992). To effectuate these concerns, the Legislature created a test for determining whether a parent's rights must be terminated in the child's best interests. N.J.S.A. 30:4C-15.1(a) requires that the Division prove by clear and convincing evidence the following four prongs:

> (1) The child's safety, health or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child;
>
> (3) The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement

outside the home and the court has considered alternatives to termination of parental rights; and

(4) Termination of parental rights will not do more harm than good.

See also A.W., 103 N.J. at 604-11.

## IV.

As noted, Bobby argues that the trial court erred in concluding the Division proved the third prong because the court "misapplied the prevailing legal standards," and the evidence failed to clearly and convincingly establish that the Division made reasonable efforts to provide him with appropriate services, "foster the parental relationship," and assist in reunification. We are unpersuaded by these arguments.

The third prong of the "best interests" standard contemplates the Division's efforts to reunify the parent and the child by assisting the parent in addressing the problems that led to placement. K.H.O., 161 N.J. at 348. Reasonable efforts is defined to include "[c]onsultation and cooperation with [the parent] in developing a plan for appropriate services; providing services that have been agreed upon, to the family, in order to further the goal of family reunifications; . . . and facilitating appropriate visitation." N.J.S.A. 30:4C-15.1(c). Services provided by the Division must be tailored to the parent's needs,

14

but "are not measured by their success." In re Guardianship of D.M.H., 161 N.J. 365, 393 (1999).

Further, the specific facts of each case are to be considered to determine if the Division made reasonable efforts. N.J. Div. of Youth & Family Servs. v. F.H., 389 N.J. Super. 576, 620 (App. Div. 2007). In determining whether the Division has made such efforts, the court may consider a parent's refusal to engage in the services the Division offers or recommends. A.W., 103 N.J. at 610.

Here, there was substantial evidence supporting Judge Ostrowski's finding that the Division made reasonable efforts to provide Bobby with services designed to overcome the circumstances that resulted in the children's out-of-home placement. See K.H.O., 161 N.J. at 354. When making its findings the court correctly viewed the Division's efforts through the prism of Bobby's extensive criminal history which included arrests and convictions for domestic violence against Sara witnessed by Blair, drug possession, weapons offenses, robbery, and aggravated assault, as well the attendant, lengthy incarcerations during Megan's and Blair's formative years. In this regard, Bobby was incarcerated following arrests in 2012 and 2013. Further, in August 2014, he was sentenced to a three-year custodial term with respect to his drug convictions.

When he was released in July 2017 to a halfway house, he was arrested again in April 2018 on drug charges and remained incarcerated through the course of the litigation and guardianship trial.

Bobby's claim that the Division's reasonable efforts were limited to a psychological evaluation and minimal contacts with the correctional facility ignore the Division's intensive engagement with him and Sara both before and after his numerous incarcerations. For example, the Division referred Bobby to domestic violence services, substance abuse and psychological evaluations. In addition, the trial record supported the court's finding that the Division contacted Bobby's prison and halfway house eight times to confirm that Bobby received services. The Division also coordinated with Bobby's parole officer to insure he was not burdened with duplicative services and testing obligations.

After he was released on parole in 2017, the Division arranged for a substance abuse evaluation which recommended a relapse prevention program. Bobby's re-incarceration in April 2018, however, prevented him from completing this service. The Division also provided therapeutic visitation

16

through Families Matter and arranged for Parent Child Interaction Therapy with Blair, which did not occur due to Bobby's arrest and re-incarceration.[3]

Bobby challenge to the court's prong three finding based on the Division's purported failure to arrange visits at the prison and foster his relationship with Blair and Megan by setting up "meaningful phone calls or contact" is equally meritless. When the Division removed Blair and Megan from Sara's care, it was during a period when the children were under the Division's care and supervision. The Division nevertheless encouraged visits between Bobby and Blair during this period, despite a court order preventing unsupervised contact with Blair or Sara due to concerns related to Bobby's extensive history of domestic violence. The Division also arranged for visits to be supervised by a relative but Bobby refused to visit Blair stating he did not want his visits

---

[3] We acknowledge that that although incarceration alone is insufficient to establish parental unfitness, "particularized evidence of how a parent's incarceration affects each prong of the best-interests-of-the-child standard" can support termination of parental rights. Div. of Youth & Family Servs. v. R.G., 217 N.J. 527, 556 (2014). Here, the court did not terminate Bobby's parental rights solely due to his repeated incarcerations. To the contrary, the court correctly noted Bobby's unavailability during critical periods in Blair's and Megan's lives, and his inability to care for them. That inability to care for Blair and Megan, and his withholding of solicitude from them, supports the court's prong three and four findings.

A-5172-17T3

supervised. Further, days before Megan's birth in 2014, Bobby was arrested and had not visited Blair for almost two years.

Contrary to Bobby's argument, the facts of the case bear no resemblance to those in R.G. In that case, the defendant was incarcerated shortly after his child's birth and remained incarcerated for over five years. Id. at 535. Prior to the defendant's imprisonment, he emotionally and financially supported his child. Further, when his child was removed from the mother's care by the Division, the defendant "immediately increased his efforts and contacted [his child] to remain part of her life." Id. at. at 560. During his incarceration, the defendant repeatedly wrote his child and once released, called daily and visited. The child also expressed a desire to see her father and during one phone call told him "I love you daddy" and "I can't wait for you to come home so we could watch movies together." Id. at 541.

Here, Bobby did not attend an approved visit with Blair or Megan before their removal, and visited once prior to serving three years in prison August 2014. While he attempted to visit after November 2017, those visits required therapeutic supervision, which the Division arranged. Unfortunately, his contact with Blair and Megan was further curtailed by his April 2018 re-incarceration. We recognize the Division's obligation to "facilitate appropriate

18

visitation," <u>see</u> N.J.S.A. 30:4C-15.1(c)(4), and are satisfied that the Division appropriately discharged its obligation here.

V.

Bobby also argues that Judge Ostrowski committed error in finding that the Division proved the fourth prong because the evidence failed to show that termination would not do more harm than good. Again, we disagree.

The final prong of the statutory best interests test assesses whether "[t]ermination of parental rights will not do more harm than good" to the child. N.J.S.A. 30:4C-15.1(a)(4). The fourth prong "serves as a fail-safe against termination even where the remaining standards have been met." <u>N.J. Div. of Youth & Family Servs. v. G.L.</u>, 191 N.J. 596, 609 (2007). The question to be addressed "is whether, after considering and balancing the two relationships, the child will suffer a greater harm from the termination of ties with her natural parents than from the permanent disruption of her relationship with her foster parents." <u>K.H.O.</u>, 161 N.J. at 355. To satisfy this prong, the State should present a "well qualified expert who has had [a] full opportunity to make a comprehensive, objective, and informed evaluation of the child's relationship with both the natural parents and the [resource] parent[]." <u>N.J. Div. of Youth & Family Servs. v. M.M.</u>, 189 N.J. 261, 281 (2007) (citations omitted).

19

With respect to the court's prong four findings, Judge Ostrowski relied upon the expert testimony of Dr. Loving and Dr. Jeffrey, who conducted bonding evaluations between the children and their resource parents. Dr. Jeffrey stated that the children and their resource parents possessed a secure and attached bond, and removing Megan and Blair from their care would cause enduring and severe harm. Dr. Loving testified similarly. He observed a strong attachment with the children and their resource parents and noted that they were capable of mitigating any harm as a result of terminating Bobby's parental rights. Both experts recommended adoption by the resource parents. Based on Dr. Loving's and Dr. Jeffrey's credible testimony that separating Megan and Blair from their resource parents, who raised both of them essentially since birth, would be "catastrophic," the court properly concluded that severing Megan and Blair's bond with their father would not do more harm than good.

In sum, after a thorough review of the record, we conclude that Judge Ostrowski's factual findings are fully supported by the record developed during the guardianship trial and, in light of those facts, his legal conclusions as to the best interests of the child test are unassailable. To the extent we have not specifically addressed any of Bobby's arguments, we find them to be without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

20

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-5172-17T3