# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2287-18T1

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

G.W.S.,

     Defendant-Appellant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF Z.Z.S.,

     a Minor.

_____

     Submitted October 2, 2019 – Decided October 21, 2019

     Before Judges Hoffman and Firko.

     On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Mercer County, Docket No. FG-11-0036-18.

     Joseph E. Krakora, Public Defender, attorney for appellant (Robyn A. Veasey, Deputy Public Defender,

of counsel; Louis W. Skinner, Designated Counsel, on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent (Jane C. Schuster, Assistant Attorney General, of counsel; Joshua Paul Bohn, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor (Meredith Alexis Pollock, Deputy Public Defender, of counsel; James Joseph Gross, Designated Counsel, on the brief).

PER CURIAM

Defendant G.W.S. (Greg)[1] appeals from a January 10, 2019 Family Part order terminating his parental rights to his daughter, Z.Z.S. (Zara). The child's biological mother, K.G. (Katherine), surrendered her parental rights in an identified surrender on August 21, 2018, to L.W., the child's maternal great-aunt and resource parent, and has not appealed. We find no merit in Greg's appeal and affirm.

I.

Zara was born in May 2014. In January 2015, the Division of Child Protection and Permanency (Division) received a report from a hospital worker that Zara suffered first and second degree burns on her genital, abdominal, and

---

[1] We use fictitious names for G.W.S., K.G., and Z.Z.S., to protect their privacy and for ease of reference. See R. 1:38-3(d)(12).

2

A-2287-18T1

upper thigh areas. A detective reported Zara sustained these burns while Katherine bathed her. Greg was incarcerated for having sexual relations with a twelve-year-old girl and advised a Division caseworker that he had not been involved in Zara's life because of his incarceration dating back to her birth. He is a registered Megan's Law[2] sex offender and is on Parole Supervision for Life.

A no contact order was entered in favor of Katherine against Greg, which he violated, resulting in a fourteen-month term of imprisonment in October 2013. He was released in December 2014 and transferred to a halfway house. Katherine brought Zara to visit Greg on a weekly basis while he was incarcerated.

The Division concluded its investigation against Katherine in March 2015 and found the allegations against her were not established. Greg called the Division multiple times to report that Katherine was not allowing him to see Zara; expressing concern the child was eating cigarettes; the child was being aggressively disciplined; and Katherine was having sex in front of Zara.

During an interview with Greg in May 2015, a caseworker informed him that he was "foaming at the mouth," insinuating he was using drugs, but he denied any substance abuse. The Division found the allegations of abuse or

---

[2] N.J.S.A. 2C:7-2 to -11.

neglect against Katherine were unfounded. Greg was incarcerated again in May 2015 for violating the no contact order.

On July 20, 2015, Judge Janetta D. Marbrey awarded joint custody of Zara to Katherine and her mother. Greg was ordered to have supervised visitation with Zara. Despite the no contact order, Greg continued to send letters to Katherine from prison. In a December 2015 letter, Greg accused Katherine of consuming alcohol and using drugs in Zara's presence, and he alleged Katherine burned the child intentionally.

After observing roaches, trash, empty bottles, and smelling a strong odor of cigarettes and diapers, the Division commenced another investigation against Katherine in December 2015 based on allegations of environmental neglect. The allegations were not established.

In February 2016, Greg was released from prison and entered a halfway house. Visitation was facilitated between Greg and Zara through his sister and other family members. At this time, Katherine was noncompliant with services at Mercer Street Friends, and Zara began receiving treatment at Children's Specialized Hospital for her speech delay.

A-2287-18T1

Greg was incarcerated again in July 2016 due to another violation of the no contact order. Around this time, Zara showed symptoms of fetal alcohol syndrome, and Katherine tested positive for marijuana.

On September 27, 2016, a Division caseworker visited Katherine's home and found it was "filthy," with "dirt on the floor," trash in the kitchen, and "hardly any food." Zara was found dirty with mucus on her nose and mouth. The Division conducted a Dodd removal of Zara that day.[3] The child was placed in the home of her maternal aunt, A.S. Thereafter, the Division filed a verified complaint in the trial court seeking care, custody, and supervision of the child. Zara was placed with L.W. in October 2016.

In January 2017, Greg was ordered to participate in anger management therapy and other services available to him at the prison. Visitation was not ordered at this time, but the Division was ordered to provide Greg with a monthly report on Zara, along with a photograph of her, and to arrange visitation every three months.

In March 2017, the Division was informed that Greg had not commenced any prison services. On April 11, 2017, a Division caseworker met with Greg

---

[3] A "Dodd" removal refers to the emergency removal of a child from the home without a court order, pursuant to the Dodd Act, N.J.S.A. 9:6-8.21 to -8.82.

A-2287-18T1

in a jail cell at the courthouse to update him on Zara. A couple of weeks later, he requested visitation with Zara at the prison and referred to the no contact order as a "fake."

Greg sent Zara a birthday card in May 2017 and requested a paternity test. In July 2017, Zara began attending a Pre-School Disabled Extended School Year program, and was given an Individualized Education Program.

On September 8 2017, Dr. Meryl Udell conducted a psychological evaluation of Greg at the prison and she planned to re-evaluate him again after his anticipated release a few months later. In her initial report, Dr. Udell recommended that no visitation take place between Greg and Zara.

On September 12, 2017, the court conducted a permanency hearing. At that proceeding, the court approved the Division's reunification plan with Katherine. Greg was incarcerated at that time. After his release on November 7, 2017, he started calling L.W. who did not return his calls. Greg accused Katherine and her new boyfriend of smoking in front of Zara, using Greg's social security number to acquire cable services, and physically attacking B.W., who is Katherine's mother.

A second permanency hearing was conducted on December 1, 2017. At that proceeding, the court approved the Division's plan for termination of

parental rights followed by adoption. Greg was ordered to complete the second part of Dr. Udell's evaluation, which included a sex offender risk assessment. The re-evaluation could not be completed because Greg was again incarcerated on December 7, 2017, after being "charged with exposing his genitals while walking towards a minor female" in violation of his parole. Greg told Dr. Udell that "he was pulled over by the police for an unrelated matter. And when they were patting him down, his penis came out of his pants[,]" because of a broken zipper.

In August, September, and November 2018, Judge Wayne J. Forrest presided over the guardianship trial. On the first day of trial, August 21, 2018, Katherine surrendered her parental rights to L.W. At the trial, the Division relied on documentary evidence and the testimony of K.B., a Division caseworker assigned to Greg's case, and Dr. Udell, who was qualified as an expert in the field of psychology by way of a stipulation. Greg testified but he failed to proffer any expert opinion or documentary evidence. He remained incarcerated throughout the proceedings and was expected to be released in June 2019.[4] The Law Guardian presented no witnesses or other evidence.

---

[4] We were not provided with updated information as to Greg's anticipated release.

Judge Forrest issued an oral and comprehensive sixty-two page written decision on January 10, 2019 that terminated Greg's parental rights and issued a conforming judgment that day. This appeal followed.

On appeal, Greg argues that the Division failed to establish all four prongs of the "best interests of the child test" under N.J.S.A. 30:4C-15.1(a) by clear and convincing evidence. Greg also claims the judge erred by allowing Dr. Udell to render a net opinion and for terminating his parental rights absent a bonding evaluation. For the reasons that follow, we disagree with each of Greg's arguments, and affirm.

## II.

As to Greg's first point, because all of the trial judge's findings were supported by evidence the judge found to be clear, convincing, and credible, they are entitled to our deference. N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 448-49 (2012); Cesare v. Cesare, 154 N.J. 394, 413 (1998).

Parents have a constitutionally protected right to the care, custody and control of their children. Santosky v. Kramer, 455 U.S. 745, 753 (1982); In re Guardianship of K.H.O., 161 N.J. 337, 346 (1999). The right to have a parental relationship, however, is not absolute. N.J. Div. of Youth & Family Servs. v. R.G., 217 N.J. 527, 553 (2014); N.J. Div. of Youth & Family Servs. v. A.W.,

103 N.J. 591, 599 (1986).  At times, a parent's interest must yield to the State's obligation to protect children from harm.  N.J. Div. of Youth & Family Servs. v. G.M., 198 N.J. 382, 397 (2009); In re Guardianship of J.C., 129 N.J. 1, 10 (1992).

To effectuate these concerns, the Legislature codified the test for determining when a parent's rights must be terminated in a child's best interests. N.J.S.A. 30:4C-15.1(a) requires that the Division prove by clear and convincing evidence the following four prongs:

> (1)  The child's safety, health or development has been or will continue to be endangered by the parental relationship;
>
> (2)  The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child;
>
> (3)  The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and
>
> (4)  Termination of parental rights will not do more harm than good.

See also <u>A.W.</u>, 103 N.J. at 604-11.

A. <u>Prong One</u>

Greg first argues that the Division failed to show by clear and convincing evidence that he harmed Zara, or will continue to harm her, and maintains the court improperly based its prong one findings on his repeated incarcerations. He further contends there was no evidence that he abandoned Zara. We disagree with Greg's arguments because the court's prong one findings are supported by substantial, credible evidence in the record.

The court determined that Greg's incarcerations rendered him unavailable to care for Zara. Moreover, due to his Megan's Law status, Greg is unable to have unsupervised contact with Zara until she is at least sixteen years old, subject to court approval. The judge found Greg "has been incarcerated for the majority of [Zara's] life, and will continue to struggle with further incarceration in the future . . . ." In addition, the judge noted Greg has a "skewed understanding of his relationship with [Katherine], and has violated the no contact order . . . and will likely continue to do that."

Under the first prong, harm to the child "must be one that threatens the child's health and will likely have continuing deleterious effects on the child." <u>K.H.O.</u>, 161 N.J. at 352. In addition to physical abuse and neglect, the mental

and emotional health of a child should be considered.  A.W., 103 N.J. at 604-05.  In this regard, a parent's failure to provide a safe and stable permanent home may establish harm under prong one.  In re Guardianship of DMH, 161 N.J. 365, 383 (1999).  Further, "[c]ourts need not wait to act until a child is actually irreparably impaired by parental inattention or neglect."  Ibid.  "[T]he focus is on the effect of harms arising from the parent-child relationship over time on the child's health and development."  K.H.O., 161 N.J. at 348.  Accordingly, "[i]ncarceration is . . . probative of whether the parent is incapable of properly caring for . . . or has abandoned the child."  R.G., 217 N.J. at 554-55 (alterations in original) (quoting In re Adoption of Children by L.A.S., 134 N.J. 127, 136 (1993)).

Here, Greg was incarcerated when Zara was born.  Although he was released less than a year later, he was reincarcerated multiple times thereafter due to parole violations.  As a result, Greg was unable to care for Zara, provide the necessary emotional and physical support during the first years of her life, or bond with her.  As the unrebutted trial testimony of Dr. Udell established, Greg's poor judgment endangered Zara because he lacks the common sense and understanding of the consequences of failing to parent her safely.  Saliently, Greg cannot live alone with Zara.

As Dr. Udell stated, Greg has failed to take responsibility for his wrongdoings, making it unlikely he would be able to change his behavior. The judge aptly found because Greg failed to "maintain a presence in [Zara's] life, [her] safety, health or development has been and will continue to be endangered by a parental relationship with [Greg]."

Finally, we disagree with Greg's assertion that the court erred in finding Zara was abandoned because of Greg's incarceration. Although incarceration alone is insufficient to establish parental unfitness, "particularized evidence of how a parent's incarceration affects each prong of the best-interests-of-the-child standard" can support termination of parental rights. R.G., 217 N.J. at 556. Here, the court did not terminate Greg's parental rights solely because he was incarcerated.

Moreover, Greg conflates the standard for determining child abandonment with the criteria for termination of parental rights. As noted, there is substantial, credible evidence in the record, independent of any abandonment claim, to support the court's finding that Zara's "safety, health, or development" has been and will continue to be, endangered by a continued relationship with Greg. See N.J.S.A. 30:4C-15.1(a)(1).

B. Prong Two

The second prong relates to parental unfitness and "focuses on the parent's ability to overcome the harm to the child." K.H.O., 161 N.J. at 352. The findings under the first prong overlap with the second. See N.J. Div. of Youth & Family Servs. v. R.L., 388 N.J. Super. 81, 88 (App. Div. 2006). A "pattern of parental inaction and neglect" may demonstrate parental unfitness. N.J. Div. of Youth & Family Servs. v. F.H., 389 N.J. Super. 576, 615 (App. Div. 2007). A court "should only determine whether it is reasonably foreseeable that the parents can cease to inflict harm upon the children entrusted to their care." A.W., 103 N.J. at 607.

With respect to prong two, Greg primarily contends that the court incorrectly relied on Dr. Udell's evaluation when it concluded he has not taken any responsibility for his actions, such as not engaging in treatment for sex offenders. While incarcerated, Greg completed a Step Program, parenting training, substance abuse programs, anger management, therapy, and a program for sex offenders, evidencing his intent to mitigate the harm Zara would face if separated from her resource parent.

The court found Greg was unwilling and unable "to nurture and care for [Zara]." As noted by the court, Greg has been repeatedly incarcerated, refuses

to acknowledge or obey the no contact order with Katherine, and he has not been involved in Zara's life for the past four and a half years. Moreover, Greg indicated that he intended to violate the no contact order upon his release from prison in June 2019.

In addition, according to Dr. Udell's evaluation, Greg was unprepared to be involved with Zara's parenting because of his "limited insight" and "lack of parenting experience[.]" Dr. Udell expressed concern that regarding Greg's sex offense, "he still holds the girl responsible for what happened [to him] because she lied . . . ."

In her psychosexual report, Dr. Udell opined that Greg still desired to be in a relationship with Katherine and to be with Zara, and did not discern any reason why he should not be. She concluded that Greg's judgment is so poor and compromised that his decision making is "potentially dangerous."

C. Prong Three

Greg next asserts the Division failed to order promptly a paternity test, schedule his psychological evaluations, and arrange visitation with Zara, who only visited him once while he was incarcerated. Again, we are unpersuaded by these arguments.

With respect to the third prong, reasonable efforts include: "consultation and cooperation with the parent in developing a plan for appropriate services; . . . providing services that have been agreed upon, to the family, in order to further the goal of family reunification; . . . [and] facilitating appropriate visitation." N.J.S.A. 30:4C-15.1(c). "The diligence of [the Division's] efforts on behalf of a parent is not measured by their success." DMH, 161 N.J. at 393. Instead, the Division's "consistent efforts to maintain and support the parent-child bond are central to the court's determination." Ibid.

The evidence established that in November 2016, Greg informed the Division he did not want to have visitation with Zara, and he did not express an interest in seeing her until April 2017. Further, visitation was suspended until Dr. Udell completed her evaluations. The judge found Dr. Udell's evaluations were delayed "[a]t no fault of anyone," due to her father's death and restrictions at the prisons.

The caseworker testified that at quarterly visits, Greg was informed as to Zara's well-being, given photographs of her, and advised as to her academic progress. Greg admitted receiving letters from a caseworker stating Zara "was doing fine, she's going to school, she's learning how to talk and stuff like that." At least six visits were made by caseworkers to the prisons where Greg was

incarcerated between 2015 and 2017, and available prison services were explained to him. Judge Forrest aptly concluded that Greg "has failed to sufficiently take advantage of the Division's services, despite the Division's reasonable efforts to provide them."

D. Prong Four

The final prong of the statutory best interests test assesses whether "[t]ermination of parental rights will not do more harm than good" to the child. N.J.S.A. 30:4C-15.1(a)(4). The fourth prong "serves as a fail-safe against termination even where the remaining standards have been met." N.J. Div. of Youth & Family Servs. v. G.L., 191 N.J. 596, 609 (2007). The question to be addressed "is whether, after considering and balancing the two relationships, the child will suffer a greater harm from the termination of ties with her natural parents than from the permanent disruption of her relationship with her foster parents." K.H.O., 161 N.J. at 355. To satisfy this prong, the State should present a "well qualified expert who has had [a] full opportunity to make a comprehensive, objective, and informed evaluation of the child's relationship with both the natural parents and the [resource] parent[]." N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 281 (2007) (citations and internal quotation marks omitted).

As Dr. Udell testified, Greg has never lived with Zara. She also noted that Zara refers to L.W. as "mom," and L.W. is the child's psychological parent. Zara's speech impediment made it difficult for Dr. Udell to understand her, but L.W. comprehends most of what Zara says.

With respect to L.W., Dr. Udell testified that she has a "positive, warm, and loving relationship" with Zara, who bonds with her as the primary caretaker. Importantly, L.W. understands Zara's needs "developmentally, physically and emotionally," according to Dr. Udell. Zara would experience severe and enduring harm if the attachment from L.W. was severed, and Zara's developmental delays would be exasperated.

Dr. Udell's testimony provides ample support for the court's findings that Zara's best interests were served by terminating Greg's parental rights to allow for her adoption by her resource parent.

### III.

Greg maintains we should reverse the court's January 10, 2019 order because no bonding evaluation was performed between himself and Zara, thereby making it impossible for Dr. Udell and the judge to find Zara would not suffer any harm if his parental rights were terminated. We disagree.

A-2287-18T1

The lack of a bonding evaluation is not critical when termination is "not predicated upon bonding, but rather reflect[s] [the child's] need for permanency and [the parent's] inability to care for him [or her] in the foreseeable future." N.J. Div. of Youth & Family Servs. v. B.G.S., 291 N.J. Super. 582, 593 (App. Div. 1996). There is no dispute that Dr. Udell opined about the importance of permanency to a child's development. She testified that removal of a child from a trusted caregiver "affects a child's ability to handle their emotions" and studies show "a correlation between the number of changes in a child's life at an early age and suicide in adolescents."

There was substantial, credible evidence, unrebutted by Greg (i.e. the effect of Greg's incarceration on Zara, and Dr. Udell's testimony), supporting each of the N.J.S.A. 30:4C-15.1(a) prongs.

To the extent not addressed, Greg's remaining arguments lack sufficient merit to warrant discussion in a written opinion. R. 2:11-33(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION